07-3885-cv
*Doninger v. Niehoff*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2007

(Argued: March 4, 2008                    Decided: May 29, 2008)

Docket No. 07-3885-cv

_____

LAUREN DONINGER, P.P.A as Guardian and Next Friend of AVERY DONINGER, a minor,
*Plaintiff-Appellant*,

-v.-

KARISSA NIEHOFF, PAULA SCHWARTZ,
*Defendants-Appellees*.

_____

Before:        SOTOMAYOR, LIVINGSTON, *Circuit Judges*,
               and PRESKA, *District Judge*.[*]

Parent of public high school student brought action against school principal and district superintendent alleging a violation of her daughter's free speech and other rights. The United States District Court for the District of Connecticut (Kravitz, J.) denied a motion for a preliminary injunction, and plaintiff appealed.

Affirmed.

JON L. SCHOENHORN, Jon L. Schoenhorn & Associates, LLC, Hartford, Connecticut, *for Plaintiff-Appellant*.

THOMAS R. GERARDE (Katherine E. Rule, *on the brief*), Howd & Ludorf, LLC, Hartford, Connecticut, *for Defendants-Appellees*.

_____

[*]The Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, sitting by designation.

Martin Margulies, Quinnipiac University School of Law, Hamden, Connecticut (Lauren Henault, Legal Intern, Quinnipiac University School of Law, Hamden, Connecticut, and Daniel J. Krisch, Horton, Shields & Knox, P.C., Hartford, Connecticut, *on the brief*), *for* Amicus Curiae, *The Center for First Amendment Rights, Inc.*, *in support of Plaintiff-Appellant*.

Robert M. O'Neil (J. Joshua Wheeler, *on the brief*), Charlottesville, Virginia, *for* Amicus Curiae, *The Thomas Jefferson Center for the Protection of Free Expression*, *in support of Plaintiff-Appellant*.

LIVINGSTON, *Circuit Judge*:

Plaintiff-Appellant Lauren Doninger ("Doninger") appeals from the August 31, 2007 order of the United States District Court for the District of Connecticut (Kravitz, J.) denying her motion for a preliminary injunction. *Doninger v. Niehoff*, 514 F. Supp. 2d 199 (D. Conn. 2007). Doninger sued Defendants-Appellees Karissa Niehoff and Paula Schwartz, respectively the principal of Lewis Mills High School ("LMHS") and the superintendent of the district in which LMHS is located, when her daughter, Avery Doninger ("Avery"), was disqualified from running for Senior Class Secretary after she posted a vulgar and misleading message about the supposed cancellation of an upcoming school event on an independently operated, publicly accessible web log (or "blog"). Doninger, alleging principally a violation of her daughter's First Amendment rights, moved for a preliminary injunction voiding the election for Senior Class Secretary and ordering the school either to hold a new election in which Avery would be allowed to participate or to grant Avery the same title, honors, and obligations as the student elected to the position, including the privilege of speaking as a class officer at graduation. The district court denied the motion, concluding that Doninger had failed to show a sufficient likelihood of success on the merits. Because Avery's blog post created a

foreseeable risk of substantial disruption at LMHS, we conclude that the district court did not abuse its discretion. We therefore affirm the denial of Doninger's preliminary injunction motion.

*Background*

LMHS is a public high school located in Burlington, Connecticut. At the time of the events recounted here, Avery Doninger was a junior at LMHS. She served on the Student Council and was also the Junior Class Secretary.

This case arises out of a dispute between the school administration and a group of Student Council members at LMHS, including Avery, over the scheduling of an event called "Jamfest," an annual battle-of-the-bands concert that these Student Council members helped to plan. The 2007 Jamfest, which had been twice postponed because of delays in the opening of LMHS's new auditorium, was scheduled for Saturday, April 28, in this newly constructed venue. Shortly before the event, however, Avery and her fellow students learned that David Miller, the teacher responsible for operating the auditorium's sound and lighting equipment, was unable to attend on that date. The students proposed that LMHS hire a professional to run the equipment or that a parent supervise student technicians, so that Jamfest could still take place on April 28 in the auditorium. At a Student Council meeting on April 24, however, the students were advised that it would not be possible to hold the event in the auditorium without Miller, so that either the date or the location of the event would need to be changed.

This announcement distressed the Student Council members responsible for coordinating preparations, for they believed there were few dates remaining to reschedule Jamfest before the end of the school year. The students were also concerned that changing the date of the event for a third time might cause some of the bands to drop out. Holding the event in the proposed alternative venue,

3

the school cafeteria, was not an acceptable solution because the bands would have to play acoustic instead of electric instruments. The students also feared there was not enough time for the bands to make the necessary modifications to their sets that this change of instrumentation would require.

Four Student Council members, including Avery, decided to take action by alerting the broader community to the Jamfest situation and enlisting help in persuading school officials to let Jamfest take place in the auditorium as scheduled. The four students met at the school's computer lab that morning and accessed one of their fathers' email account. They drafted a message to be sent to a large number of email addresses in the account's address book, as well as to additional names that Avery provided. The message stated, in substance, that the administration had decided that the Student Council could not hold Jamfest in the auditorium because Miller was unavailable. It requested recipients to contact Paula Schwartz, the district superintendent, to urge that Jamfest be held as scheduled, as well as to forward the email "to as many people as you can." All four students signed their names and sent the email. The message was sent out again later that morning to correct an error in the telephone number for Schwartz's office.

Both Schwartz and Niehoff received an influx of telephone calls and emails from people expressing concern about Jamfest. Niehoff, who was away from her office for a planned in-service training day, was called back by Schwartz as a result. Later that day, Niehoff encountered Avery in the hallway at LMHS. Avery claimed that Niehoff told her that Schwartz was very upset "and that[,] as a result, Jamfest had been cancelled." *Doninger*, 514 F. Supp. 2d at 205. The district court found otherwise, however, crediting Niehoff's testimony denying that she ever told Avery the event would not be held.

According to Niehoff, she advised Avery that she was disappointed the Student Council

members had resorted to a mass email rather than coming to her or to Schwartz to resolve the issue. She testified that class officers are expected to work cooperatively with their faculty advisor and with the administration in carrying out Student Council objectives. They are charged, in addition, with "demonstrat[ing] qualities of good citizenship at all times." *Id*. at 214. The district court found that Niehoff discussed these responsibilities with Avery in their conversation on April 24. She told Avery that the email contained inaccurate information because Niehoff was, in fact, amenable to rescheduling Jamfest so it could be held in the new auditorium. Niehoff asked Avery to work with her fellow students to send out a corrective email. According to Niehoff, Avery agreed to do so.

That night, however, Avery posted a message on her publicly accessible blog, which was hosted by livejournal.com, a website unaffiliated with LMHS. The blog post began as follows:

> jamfest is cancelled due to douchebags in central office. here is an email that we sent to a ton of people and asked them to forward to everyone in their address book to help get support for jamfest. basically, because we sent it out, Paula Schwartz is getting a TON of phone calls and emails and such. we have so much support and we really appriciate it. however, she got pissed off and decided to just cancel the whole thing all together. anddd so basically we aren't going to have it at all, but in the slightest chance we do it is going to be after the talent show on may 18th. andd..here is the letter we sent out to parents.

The post then reproduced the email that the Student Council members sent that morning. The post continued:

> And here is a letter my mom sent to Paula [Schwartz] and cc'd Karissa [Niehoff] to get an idea of what to write if you want to write something or call her to piss her off more. im down.—

Avery then reproduced an email that her mother had sent to Schwartz earlier in the day concerning the dispute.

Avery testified before the district court that "im down" meant that she approved of the idea

5

of others contacting Schwartz to "piss her off more." She stated that the purpose of posting the blog entry was "to encourage more people than the existing e-mail already encouraged to contact the administration" about Jamfest. The district court concluded that the content of the message itself suggested that her purpose was "to encourage her fellow students to read and respond to the blog." *Id.* at 206. The district court also noted that "[s]everal LMHS students posted comments to the blog, including one in which the author referred to Ms. Schwartz as a 'dirty whore.'" *Id.* at 206-07.

The following morning, Schwartz and Niehoff received more phone calls and email messages regarding Jamfest. The pair, along with Miller, Jennifer Hill, the students' faculty advisor, and David Fortin, LMHS's building and grounds supervisor, met with the Student Council members who sent the email the day before. They agreed during this meeting that Jamfest would be rescheduled for June 8, 2007. Niehoff announced this resolution in the school newsletter and the students notified the recipients of the April 24 email. In her testimony before the district court, Avery denied that Schwartz and Niehoff also spoke to the students during this meeting about the impropriety of mass emails in this context and the proper conduct of student officers in resolving disputes with the administration. According to the district court, however, Schwartz and Niehoff "at the very least, made clear to the students that appealing directly to the public was not an appropriate means of resolving complaints the students had regarding school administrators' decisions." *Id*. at 207. The district court also found that, as a result of the Jamfest controversy, both Schwartz and Niehoff were forced to miss or arrived late to several school-related activities scheduled for April 24 and April 25. *Id.* at 206.

The April 25 meeting resolved the dispute over Jamfest's scheduling. Indeed, Jamfest was successfully held on June 8, with all but one of the scheduled bands participating. Even after this

resolution, however, Schwartz and Niehoff, unaware of Avery's blog post, continued to receive phone calls and emails in the controversy's immediate aftermath. According to Schwartz's testimony, she learned of Avery's posting only some days after the meeting when her adult son found it while using an Internet search engine. Schwartz alerted Niehoff to the blog post on May 7, 2007. Niehoff concluded that Avery's conduct had failed to display the civility and good citizenship expected of class officers. She noted that the posting contained vulgar language and inaccurate information. In addition, Avery had disregarded her counsel regarding the proper means of addressing issues of concern with school administrators. After researching Connecticut education law and LMHS policies, Niehoff decided that Avery should be prohibited from running for Senior Class Secretary. Because Avery had Advanced Placement exams at that time, however, Niehoff chose not to confront her immediately.

On May 17, Avery came to Niehoff's office to accept her nomination for Senior Class Secretary. Niehoff handed Avery a printed copy of the April 24 blog post and requested that Avery apologize to Schwartz in writing, show a copy of the post to her mother, and withdraw her candidacy. Avery complied with the first two requests, but refused to honor the third. In response, Niehoff declined to provide an administrative endorsement of Avery's nomination, which effectively prohibited her from running for Senior Class Secretary, though Avery was permitted to retain her positions as representative on the Student Council and as Junior Class Secretary. According to the district court, Niehoff explained that her decision was based on: (1) Avery's failure to accept her counsel "regarding the proper means of expressing disagreement with administration policy and seeking to resolve those disagreements"; (2) the vulgar language and inaccurate information included in the post; and (3) its encouragement of others to contact the central office "to piss [Schwartz] off

7

more," which Niehoff did not consider appropriate behavior for a class officer. *Id*. at 208.

As a result of Niehoff's decision, Avery was not allowed to have her name on the ballot or to give a campaign speech at a May 25 school assembly regarding the elections. Apart from this disqualification from running for Senior Class Secretary, she was not otherwise disciplined. Even though she was not permitted to be on the ballot or to campaign, Avery received a plurality of the votes for Senior Class Secretary as a write-in candidate. The school did not permit her to take office, however, and the second-place candidate became class secretary for the Class of 2008.

Lauren Doninger filed a complaint in Connecticut Superior Court asserting claims under 42 U.S.C. § 1983 and state law. She principally alleged violations of her daughter's rights under the First Amendment to the United States Constitution and analogous clauses of the Connecticut Constitution. She also alleged violations of Avery's due process and equal protection rights under the Fourteenth Amendment, and asserted a cause of action for intentional infliction of emotional distress under state law. Doninger sought damages and an injunction requiring, among other things, that school officials hold new class secretary elections in which Avery would be allowed to run, and that Avery be permitted, as a duly elected class officer, to speak at the 2008 commencement ceremony.

Schwartz and Niehoff removed the action to the District of Connecticut. Doninger filed a motion for a preliminary injunction. The district court developed the facts outlined here from exhibits, affidavits, deposition testimony, and the hearing testimony of ten live witnesses, including students, faculty, administrators, and parents. The district court concluded that a preliminary injunction was not warranted because Doninger did not show a sufficient likelihood of success on the merits. This appeal followed.

*Discussion*

A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). When the movant seeks a "mandatory" injunction — that is, as in this case, an injunction that will alter rather than maintain the status quo — she must meet the more rigorous standard of demonstrating a "clear" or "substantial" likelihood of success on the merits. *Id*. at 24-25. We review the denial of a preliminary injunction for abuse of discretion. *Id*. at 24. Because Doninger seeks the vindication of First Amendment rights, however, "subject to the provision of Federal Rule of Civil Procedure 52(a) that '[f]indings of fact . . . shall not be set aside unless clearly erroneous,' we . . . make a fresh examination of crucial facts" and independently examine the record to do so. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567-68 (1995) (alteration and first omission in original); *accord Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996).

The loss of First Amendment freedoms, for even minimal periods of time, normally constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003). Even when a complaint alleges First Amendment injuries, however, our case law suggests that at least in circumstances in which a plaintiff does not allege injury from a rule or regulation that directly limits speech, irreparable harm is not presumed and must still be shown. *See Bronx Household of Faith*, 331 F.3d at 349-50. The district court assumed that Doninger had adequately demonstrated that Niehoff's actions had or were likely to

9

have a chilling effect on speech in light of Avery's assertion that she has limited her email and blog communications in an effort to avoid similar conflict with school administrators in the future. *Doninger*, 514 F. Supp. 2d at 211. We, too, assume for the purposes of this appeal that Doninger met her burden of showing irreparable harm and proceed to address whether she also demonstrated a clear or substantial likelihood of success on the merits.

## I. The First Amendment Claim

We begin with some basic principles. It is axiomatic that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). It is equally the case that the constitutional rights of students in public school "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), but must instead be applied in a manner consistent with the "special characteristics of the school environment," *Tinker*, 393 U.S. at 506. Thus, school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." *Id*. at 513. Vulgar or offensive speech — speech that an adult making a political point might have a constitutional right to employ — may legitimately give rise to disciplinary action by a school, given the school's responsibility for "teaching students the boundaries of socially appropriate behavior." *Fraser*, 478 U.S. at 681. Similarly, so long as their actions are "reasonably related to legitimate pedagogical concerns," educators are entitled to exercise editorial control over school-sponsored expressive activities such as school publications or theatrical productions. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Such controls "assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be

10

inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id*. at 271. Finally, given the special nature of the school environment and the "serious and palpable" dangers posed by student drug abuse, public schools may also "take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Morse v. Frederick*, 551 U.S. —, 127 S. Ct. 2618, 2622, 2629 (2007).

The Supreme Court has yet to speak on the scope of a school's authority to regulate expression that, like Avery's, does not occur on school grounds or at a school-sponsored event. We have determined, however, that a student may be disciplined for expressive conduct, even conduct occurring off school grounds, when this conduct "would foreseeably create a risk of substantial disruption within the school environment," at least when it was similarly foreseeable that the off-campus expression might also reach campus. *Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 40 (2d Cir. 2007), *cert. denied*, 128 S. Ct. — (2008).[1] We are acutely attentive in this context to the need to draw a clear line between student activity that "affects matter of legitimate concern to the school community," and activity that does not. *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1058 n.13 (2d Cir. 1979) (Newman, J., concurring in the result). But as Judge Newman accurately observed some years ago, "territoriality is not necessarily a useful concept in determining the limit of [school administrators'] authority." *Id*. True enough in 1979, this observation is even more apt today, when students both on and off campus routinely participate in school affairs, as well as in other expressive

---

[1]The *Wisniewski* panel divided on the question whether it was necessary in that case to show that it was reasonably foreseeable that the expression at issue would reach school property. Two panel members concluded that the undisputed fact that it did so "pretermit[ted] any inquiry as to this aspect of reasonable foreseeability." 494 F.3d at 39.

11

activity unrelated to the school community, via blog postings, instant messaging, and other forms of electronic communication. It is against this background that we consider whether the district court abused its discretion in concluding that Doninger failed to demonstrate a clear likelihood of success on the merits of her First Amendment claim.

## A.

If Avery had distributed her electronic posting as a handbill on school grounds, this case would fall squarely within the Supreme Court's precedents recognizing that the nature of a student's First Amendment rights must be understood in light of the special characteristics of the school environment and that, in particular, offensive forms of expression may by prohibited. *See Fraser*, 478 U.S. at 682-83. As the Supreme Court explained in *Fraser*, a school may regulate "plainly offensive" speech — that is, speech that is "offensively lewd and indecent" — in furtherance of its important mission to "inculcate the habits and manners of civility," both as values in themselves and because they are indispensable to democratic self-government. *Id.* at 681, 683, 685. As the Court noted, "[t]he undoubted freedom to advocate unpopular and controversial views in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." *Id.* at 681. It is thus "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* at 683.

To be clear, *Fraser* does not justify restricting a student's speech merely because it is inconsistent with an educator's sensibilities; its reference to "plainly offensive speech" must be understood in light of the vulgar, lewd, and sexually explicit language that was at issue in that case. We need not conclusively determine *Fraser*'s scope, however, to be satisfied that Avery's posting — in which she called school administrators "douchebags" and encouraged others to contact

12

Schwartz "to piss her off more" — contained the sort of language that properly may be prohibited in schools. *See id. Fraser* itself approvingly quoted Judge Newman's memorable observation in *Thomas* that "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Fraser*, 478 U.S. at 682-83 (quoting *Thomas*, 607 F.2d at 1057 (Newman, J., concurring in the result)); *cf. Cohen v. California*, 403 U.S. 15 (1971) (holding that adult could not be prosecuted for wearing jacket displaying expletive). Avery's language, had it occurred in the classroom, would have fallen within *Fraser* and its recognition that nothing in the First Amendment prohibits school authorities from discouraging inappropriate language in the school environment.

B.

It is not clear, however, that *Fraser* applies to off-campus speech. Doninger's principal argument on appeal is that because Avery's posting took place within the confines of her home, it was beyond the school's regulatory authority unless it was reasonably foreseeable that the posting would create a risk of substantial disruption within the school environment — the standard enunciated in *Tinker* and *Wisniewski*, and a standard, Doninger argues, that the present record does not satisfy. Appellees argue, in contrast, that the *Tinker* test is not the only standard for determining whether school discipline may properly be imposed for off-campus expressive activity. They contend that in *Wisniewski*, we implicitly affirmed that schools may regulate off-campus offensive speech of the sort in which Avery engaged, so long as it is likely to come to the attention of school authorities. We reject appellees' broad reading of *Wisniewski* on the ground that we had no occasion to decide in that case whether *Fraser* governs such off-campus student expression. We agree, however, with appellees' alternative argument that, as in *Wisniewski*, the *Tinker* standard has been

13

adequately established here.[2] We therefore need not decide whether other standards may apply when considering the extent to which a school may discipline off-campus speech.

*Tinker* provides that school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. In *Wisniewski*, we applied this standard to an eighth grader's off-campus creation and Internet transmission to some fifteen friends of a crudely drawn icon that "depict[ed] and call[ed] for the killing of his teacher." 494 F.3d at 38. We recognized that off-campus conduct of this sort "can create a foreseeable risk of substantial disruption within a school" and that, in such circumstances, its off-campus character does not necessarily insulate the student from school discipline. *Id.* at 39. We determined that school discipline was permissible because it was reasonably foreseeable that the icon would come to the attention of school authorities and that it would create a risk of substantial disruption. *See id.* at 39-40.

Applying the framework set forth in *Wisniewski*, the record amply supports the district court's conclusion that it was reasonably foreseeable that Avery's posting would reach school property. Indeed, the district court found that her posting, although created off-campus, "was purposely designed by Avery to come onto the campus." *Doninger*, 514 F. Supp. 2d at 216. The blog posting directly pertained to events at LMHS, and Avery's intent in writing it was specifically "to encourage her fellow students to read and respond." *Id*. at 206. As the district court found, "Avery knew other LMHS community members were likely to read [her posting]." *Id.* at 217. Several

---

[2] In reaching this conclusion, we acknowledge that the district court did not expressly rely on *Tinker* to determine that Doninger was unlikely to succeed on her First Amendment claim. We nevertheless may "affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court." *ACEquip, Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir. 2003).

students did in fact post comments in response to Avery and, as in *Wisniewski*, the posting managed to reach school administrators. *See Wisniewski*, 494 F.3d at 39. The district court thus correctly determined that in these circumstances, "it was reasonably foreseeable that other LMHS students would view the blog and that school administrators would become aware of it." *Doninger*, 515 F. Supp. 2d at 217.

Contrary to Doninger's protestations, moreover, the record also supports the conclusion that Avery's posting "foreseeably create[d] a risk of substantial disruption within the school environment." *Wisniewski*, 494 F.3d at 40. There are three factors in particular on which we rely to reach this conclusion. First, the language with which Avery chose to encourage others to contact the administration was not only plainly offensive, but also potentially disruptive of efforts to resolve the ongoing controversy. Her chosen words — in essence, that others should call the "douchebags" in the central office to "piss [them] off more" — were hardly conducive to cooperative conflict resolution. Indeed, at least one LMHS student (the one who referred to Schwartz as a "dirty whore") responded to the post's vulgar and, in this circumstance, potentially incendiary language with similar such language, thus evidencing that the nature of Avery's efforts to recruit could create a risk of disruption.

Second, and perhaps more significantly, Avery's post used the "at best misleading and at wors[t] false" information that Jamfest had been cancelled in her effort to solicit more calls and emails to Schwartz. *Doninger*, 514 F. Supp. 2d at 202. The district court found that Avery "strongly suggested in her [post] that Jamfest had been cancelled, full stop, despite the fact that Ms. Niehoff, even according to Avery's own testimony, offered the possibility of rescheduling Jamfest later in the school year." *Id.* at 214. This misleading information was disseminated amidst circulating rumors

15

of Jamfest's cancellation that had already begun to disrupt school activities. Avery herself testified that by the morning of April 25, students were "all riled up" and that a sit-in was threatened because students believed the event would not be held. Schwartz and Niehoff had received a deluge of calls and emails, causing both to miss or be late to school-related activities. *Id.* at 206. Moreover, Avery and the other students who participated in writing the mass email were called away either from class or other activities on the morning of April 25 because of the need to manage the growing dispute, as were Miller, Hill, and Fortin. It was foreseeable in this context that school operations might well be disrupted further by the need to correct misinformation as a consequence of Avery's post.

Although Doninger argues that *Tinker* is not satisfied here because the burgeoning controversy at LMHS may have stemmed not from Avery's posting, but rather from the mass email of April 24, this argument is misguided insofar as it implies that *Tinker* requires a showing of actual disruption to justify a restraint on student speech. As the Sixth Circuit recently elaborated, "[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place." *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007); *see also LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001) ("*Tinker* does not require school officials to wait until disruption actually occurs before they may act."). The question is not whether there has been actual disruption, but whether school officials "might reasonably portend disruption" from the student expression at issue. *LaVine*, 257 F.3d at 989; *see also Nuxoll v. Indian Prairie Sch. Dist.* #204, — F.3d —, 2008 WL 1813137, at *5 (7th Cir. 2008).[3] Here, given

_____

[3]This "reasonable forecast" test applies both to instances of prior restraint, where school authorities prohibit or limit expression before publication, and to cases like this one, where Avery's disqualification from student office followed as a consequence of the post she had already made available to other students. *See Boucher v. Sch. Bd. Of Greenfield*, 134 F.3d 821, 828 (7th Cir. 1998); *see also Wisniewski*, 494 F.3d at 40 (applying "foreseeable risk of

the circumstances surrounding the Jamfest dispute, Avery's conduct posed a substantial risk that LMHS administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate misguided anger or confusion over Jamfest's purported cancellation.

Finally, the district court correctly determined that it is of no small significance that the discipline here related to Avery's extracurricular role as a student government leader. The district court found this significant in part because participation in voluntary, extracurricular activities is a "privilege" that can be rescinded when students fail to comply with the obligations inherent in the activities themselves. *Doninger*, 514 F. Supp. 2d at 214. We consider the relevance of this factor instead in the context of *Tinker* and its recognition that student expression may legitimately be regulated when school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. More specifically, Avery's conduct risked not only disruption of efforts to settle the Jamfest dispute, but also frustration of the proper operation of LMHS's student government and undermining of the values that student government, as an extracurricular activity, is designed to promote. *Doninger*, 514 F. Supp. 2d at 215; *cf. Hazelwood*, 484 U.S. at 273 (holding that educators may exercise control over school-sponsored expressive activities "so long as their actions are reasonably related to legitimate pedagogical concerns").

In this way, the instant case bears similarity to *Lowery v. Euverard*, which involved a group of high school football players who were removed from the team after signing a petition expressing

---

substantial disruption" test where student was disciplined for expression that had already been disseminated to other students and reached the school).

17

their hatred of the coach and their desire not to play for him. The players lodged a First Amendment claim and the Sixth Circuit determined that the relevant question under *Tinker* was whether it was reasonable for school officials "to forecast that the petition would disrupt the team" — meaning that the petition might foreseeably frustrate efforts to teach the values of sportsmanship and team cohesiveness through participation in sport as an extracurricular activity. *Lowery*, 497 F.3d at 593, 596. The court noted that the players had not been suspended from school or even prevented from further criticizing the coach: "[T]hey are free to continue their campaign to have Euverard fired. What they are not free to do is continue to play football for him while actively working to undermine his authority." *Id.* at 600 (emphases omitted). The court held that there had been no First Amendment violation.

Similarly, Avery was disqualified from running for Senior Class Secretary after school administrators determined that her behavior was not "consistent with her desired role as a class leader" — meaning in this context that it was inconsistent with LMHS school policy providing that student government should teach good citizenship and that any student who does not maintain a record of such citizenship may not represent fellow students. *Doninger*, 514 F. Supp. 2d at 215. The district court determined not only that Avery's posting was offensive and misleading, but also that it "clearly violate[d] the school policy of civility and cooperative conflict resolution." *Id.* at 214. The court credited Niehoff's testimony that class officers are expected to "work toward the objectives of the Student Council, work cooperatively with their advisor and with the administration, and promote good citizenship both in school and out." *Id.* The court explicitly found, moreover, that Niehoff advised Avery of these responsibilities during their conversation on April 24, and that she told Avery that the original Jamfest email and its approach to conflict resolution with the

18

administration were inappropriate. *Id.* As the district court observed, "[u]nderstandably, then, Ms. Niehoff testified that a factor of particular relevance in her disciplinary decision was the fact that Avery posted her blog entry" — which reproduced the email Niehoff had criticized — "the very evening of the day on which that conversation occurred." *Id.*

Given the cumulative effect of these findings, clearly supported by the record, we conclude that the district court did not abuse its discretion in determining that Doninger failed to demonstrate a sufficient likelihood of success on her First Amendment claim. We are mindful that, given the posture of this case, we have no occasion to consider whether a different, more serious consequence than disqualification from student office would raise constitutional concerns. *See Wisniewski*, 494 F.3d at 40. We decide only that based on the existing record, Avery's post created a foreseeable risk of substantial disruption to the work and discipline of the school and that Doninger has thus failed to show clearly that Avery's First Amendment rights were violated when she was disqualified from running for Senior Class Secretary.

## II. The Additional Claims

We similarly conclude that the district court did not abuse its discretion in finding that Doninger failed to establish a clear likelihood of success on her equal protection claim. Doninger proceeds on a "class-of-one" theory, arguing that Schwartz and Niehoff intentionally singled Avery out for punitive treatment because she exercised her First Amendment rights. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). She argues that Avery was similarly situated to the other Student Council officers who signed the mass email but who were not disqualified from running for office. However, a class-of-one plaintiff must show, among other things, an "extremely high degree of similarity between [herself] and the persons to whom [she] compare[s] [herself]" in

19

order to succeed on an equal protection claim. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). It is undisputed that Avery was disqualified from running for Senior Class Secretary because of her April 24 posting on livejournal.com. There is no evidence that any other of the Student Council members who signed the email participated in composing the blog post or authored any other message like it. The record therefore supports the district court's conclusion that Doninger "failed to make a clear or substantial showing of likelihood of success regarding her *Olech* equal protection claims." *Doninger*, 514 F. Supp. 2d at 220.

Finally, Doninger argues that the Connecticut Constitution affords broader protections than those of the First Amendment and that, as a result, Connecticut students may "retain the ability to engage in 'vibrant public speech' that may exceed even that permitted under *Tinker*." Brief of Plaintiff-Appellant at 51. She concedes, however, that she can cite "no Connecticut cases that expressly find broader speech rights for students than are available under the federal constitution." *Id*. The district court did not rule on the issue whether Doninger is entitled to interim relief under Connecticut law, and for this reason we ordinarily would remand to permit the court to do so. *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 137 n.4 (2d Cir. 2003). But given Doninger's failure to bring relevant Connecticut case law to our attention and that a timely ruling is of the essence, we conclude that at this juncture in the litigation, Doninger has not demonstrated a sufficient likelihood of success on this claim to support the mandatory injunction that she seeks. *See AIDS Action Comm. of Mass., Inc. v. Mass. Bay Trans. Auth.*, 42 F.3d 1, 7 (1st Cir. 1994) (noting propriety of considering First Amendment issue not addressed by district court where doing so would "further[] the interest of judicial economy by avoiding the remand of a question over which we eventually will exercise full review" and "serve[] the interest of expediency" on a question requiring a timely ruling); *see*

*also Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 697 (2d Cir. 1965) (reaching issue not addressed by district court because "no useful purpose would be served by leaving the question to be resolved by the District Court upon further proceedings, and in order to expedite this litigation").

## *Conclusion*

Avery, by all reports, is a respected and accomplished student at LMHS. We are sympathetic to her disappointment at being disqualified from running for Senior Class Secretary and acknowledge her belief that in this case, "the punishment did not fit the crime." *Doninger*, 514 F. Supp. 2d at 202 (internal quotation marks omitted). We are not called upon, however, to decide whether the school officials in this case exercised their discretion wisely. Local school authorities have the difficult task of teaching "the shared values of a civilized social order" — values that include our veneration of free expression *and* civility, the importance we place on the right of dissent *and* on proper respect for authority. *Fraser*, 478 U.S. at 683. Educators will inevitably make mistakes in carrying out this delicate responsibility. Nevertheless, as the Supreme Court cautioned years ago, "[t]he system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members," and we are not authorized to intervene absent "violations of specific constitutional guarantees." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

The judgment of the district court is therefore affirmed.

21