09-1651-cv
R.O. v. Ithaca City Sch. Dist.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2010

(Argued: December 9, 2010                                    Decided: May 18, 2011)

Docket No. 09-1651-cv

R.O., a minor, by his parent and guardian JONATHAN OCHSHORN, T.S., a minor, by his parent and
guardian MARK E. SORRELLS, ANDREW M. H. ALEXANDER, HARRY T. STINSON, L.F., a minor, by his
parent and guardian ELIZABETH A. FATTARUSO, A.H., a minor, by his parent and guardian TERESA
HALPERT DES CHAINES, BRYAN ELLERBROCK, P.P., a minor, by his parent and guardian RAMESH RAJ
POKHAREL,

                    *Plaintiffs-Appellants*,

        v.

ITHACA CITY SCHOOL DISTRICT, JUDITH C. PASTEL, Superintendent, in her official and individual
capacities, JOSEPH WILSON, Ithaca High School Principal, in his official and individual capacities,

                    *Defendants-Appellees*.

Before: CABRANES and CHIN, *Circuit Judges*, KORMAN, *District Judge*.[*]

        Appeal from a March 23, 2009 judgment of the United States District Court for the

Northern District of New York (Norman A. Mordue, *Chief Judge*). Plaintiffs claim that defendants

violated their First and Fourteenth Amendment rights by prohibiting the publication of a

sexually-explicit cartoon in the Ithaca High School student newspaper and by prohibiting the on-

campus distribution of an independent student newspaper containing the same cartoon. We hold

that defendants complied with the standards for regulation of speech in public schools set forth in

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 683 (1986), which affords schools wide discretion

---

[*] The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York,
sitting by designation.

to prohibit speech that is "lewd, indecent, or offensive," and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), which permits schools to censor school-sponsored speech in ways "reasonably related to legitimate pedagogical concerns."

Affirmed.

RAYMOND M. SCHLATHER, Schlather, Stumbar, Parks & Salk LLP, Ithaca, NY, *for plaintiffs-appellants.*

MARK J. LEMIRE, Lemire Johnson, LLC, Malta, NY, *for defendants-appellees.*

Joseph P. Esposito (Thomas C. Goodhue, Ian Conner, and Dennis Gucciardo, Hunton & Williams; Frank D. LoMonte and Michael C. Hiestand, Student Press Law Center, *on the brief*), Washington, D.C. and Arlington, VA, *for amici curiae Student Law Press Center, Journalism Education Association, and National Scholastic Press Association, in support of plaintiffs-appellants.*

JOSÉ A. CABRANES, *Circuit Judge*:

Not for the first time, and surely not for the last, we consider a claim by students in a public high school that administrators have violated their constitutional rights of free expression. The extensive jurisprudence governing student discipline in the public schools was spawned by the portentous and quotable pronouncement of the Supreme Court four decades ago that "[i]t can hardly be argued that either students or teachers shed their constitutional rights of freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

This case involves a public high school's effort to regulate the sexually-explicit content of student publications to be distributed on campus grounds. Plaintiffs, former students of Ithaca High School ("IHS"), appeal from a March 23, 2009 judgment of the United States District Court for the Northern District of New York (Norman A. Mordue, *Chief Judge*) granting partial summary

judgment[1] in favor of defendants, Ithaca City School District ("ICSD") and various school administrators, for alleged violations of plaintiffs' rights under the First and Fourteenth Amendments.

In their complaint, plaintiffs asserted principally that: (1) defendants unlawfully required plaintiffs to submit articles to a Faculty Advisor before they could be published in the Ithaca High School student newspaper, *The IHS Tattler* ("*The Tattler*"); (2) defendants unlawfully prohibited the publication of a sexually explicit stick-figure cartoon in the February 2005 issue of *The Tattler*; and (3) defendants unlawfully prohibited on-campus distribution of an independent student newspaper, *The March Issue*, containing the same sexually explicit cartoon.

Plaintiffs sought damages for these alleged violations of their constitutional rights. Plaintiffs further sought a declaratory judgment that ICSD's "Guidelines for *The Tattler* Advisor and Editors" (which, among other things, included the requirement that plaintiffs submit potential articles to a Faculty Advisor for review) were unconstitutional, as well as an injunction preventing defendants from adopting and implementing the Guidelines.

We hold that defendants complied with the standards for regulation of speech in public schools set forth in *Bethel School District Number 403 v. Fraser*, 478 U.S. 675, 683 (1986), which permits schools wide discretion to prohibit speech that is "lewd, indecent, or offensive," and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988), which permits schools to censor school-sponsored speech in ways "reasonably related to legitimate pedagogical concerns."

The judgment of the District Court is affirmed.

---

[1] Plaintiffs subsequently submitted a motion for certification of the partial judgment, pursuant to Fed. R. Civ. P. 54(b). *See also* 28 U.S.C. § 1291 (setting forth the "final judgment rule"). The District Court granted this request on January 26, 2010.

**BACKGROUND**

**A. Overview of** *The Tattler*

The Tattler is the Ithaca High School newspaper. Each month approximately 3,000 copies of *The Tattler* are printed and distributed to students by placing copies in each homeroom and throughout the school's common areas. The paper is also distributed to IHS teachers, to the faculty mailboxes of ICSD middle schools and elementary schools, and to cafes and shops in the surrounding neighborhoods. About two-thirds of the printed issues of *The Tattler* are distributed on ICSD grounds.

The editors of *The Tattler* are all IHS students and are permitted to work on the paper during school hours when there is no conflict with their classes, such as during free periods and lunch periods. In certain cases, students may receive course credit for their work.

*The Tattler* is funded largely by ICSD, including ICSD's provision and maintenance of the newspaper's office space, a stipend for the Faculty Advisor, a budget for printing and distribution expenses, and money for the staff to attend student journalism conferences. Other funding is provided by the advertising sales made by students to local merchants, as well as by student contributions of items such as extra office furnishings and office supplies.

Since 1979, *The Tattler* has operated under the supervision of an IHS teacher appointed as the paper's Faculty Advisor. The precise role of the Advisor is disputed, but the parties agree that the Advisor provides general guidance to the student staff and has the "final say" regarding content and publication in at least some circumstances, specifically "in cases involving articles that are libelous[,] . . . obscene[,] . . . or [ ] that advocate immediate, violent disruption of school activities."[2]

---

[2] Stephanie Vinch, who served as the Faculty Advisor from 2003 to 2005 (including the period in which the present dispute arose), testified that it was her understanding that the Faculty Advisor "had final say over the content of [all] *The Tattler* articles," including those that were not libelous, obscene, or otherwise disruptive.

**B. ICSD's Censorship of the Stick-Figure Cartoon**

In late December 2004 or early January 2005, Faculty Advisor Stephanie Vinch ("Vinch") received a pre-publication draft or "proof set" of the January issue of *The Tattler*. The proof set included a cartoon created to accompany an article written by a former IHS student entitled: "Alumni Advice: Sex is fun!" The cartoon depicted a doorway with the phrase "Health 101" written over the door. Near the doorway, a teacher pointed to a blackboard that contained eight drawings of stick figures in various sexual positions, with the phrase "Test on Monday" written on the blackboard underneath the drawings.

After reviewing the cartoon and article, Vinch deemed them to be inappropriate for publication in a high school newspaper. Accordingly, she "crossed out" the cartoon and the accompanying article on the proof set. The January 2005 issue of *The Tattler* was printed without the cartoon and accompanying article. The student editors did not appeal Vinch's decision.

Also during December 2004 or January 2005, Vinch met with the IHS Principal, Joseph Wilson ("Wilson"), and the ICSD Assistant Superintendent, William Russell ("Russell"), to discuss her possible resignation as Faculty Advisor. She explained that she perceived "increasing resistance by the staff of *The Tattler* to [her] role as Faculty Advisor" and proposed implementing a set of guidelines to more clearly define her responsibilities and those of the student editors. Vinch subsequently provided a set of proposed guidelines to Russell, who, in turn, discussed them with ICSD Superintendent Judith Pastel ("Pastel") and with ICSD's lawyers. On January 21, 2005, Vinch, Wilson, and Russell met with *The Tattler* editors and distributed a document setting forth "Guidelines for *The Tattler* Advisor and Editors," as follows:

- *The Tattler* is an Ithaca High School-sponsored publication of the Ithaca City School District . . . [intended] to inform the school community about matters of news and interest, to serve as a forum for student views and opinion, and to impart journalist skills to Ithaca High School Students.

- The faculty advisor to *The Tattler* will be given a list of story ideas before story assignments are distributed to writers. The advisor must approve all stories before they are assigned.

- The advisor to *The Tattler* shall read, edit and approve all articles prior to publication. No issue of *The Tattler* may be sent to the printer without final approval of the adviser.

- In a manner that is consistent with the standards established by the Supreme Court in *Tinker* and *Hazelwood*, the advisor has the right to change, edit or remove content that[:]

  - would substantially interfere with the District's work or impinge upon the rights of other students; or

  - is inconsistent with the legitimate pedagogical concerns of the District (for example, content that is ungrammatical, poorly written, inadequately researched, inaccurate, libelous, biased or prejudiced, unethical, vulgar or profane, or is not suitable for immature audiences).

In the February 2005 issue of the newspaper, *The Tattler* editors sought to print the same stick-figure cartoon that Vinch had previously rejected. This time, the editors proposed that the cartoon accompany a more serious article entitled: "How is Sex Being Taught In Our Health Class?" Once again, Vinch refused to allow the cartoon to be published in the newspaper. However, Vinch permitted the accompanying article (without the cartoon) to appear in the February issue of *The Tattler*.

On January 31, 2005, plaintiff R.O. sent a letter to Principal Wilson formally appealing Vinch's decision. R.O. claimed that his First Amendment rights had been violated by Vinch's censorship of the cartoon; he further claimed that the Guidelines for *The Tattler* were unconstitutional.

On February 3, 2005, Vinch resigned as Faculty Advisor of *The Tattler*. As a result of the lack of an appointed Faculty Advisor, *The Tattler* did not publish any issues during the months of March, April, or May 2005.

On February 9, 2005, Principal Wilson denied R.O.'s appeal of Vinch's decision to censor the cartoon. He also refused to rescind the Guidelines. Wilson explained his decision as follows:

> We believe that the nature of the cartoon, which depicts stick figures in various sexual positions, was obscene and not suitable for immature audiences, and consequently, was inconsistent with the educational mission and concerns of the District. . . .[T]he cartoons provided sufficient graphic detail, which may potentially force immature students to be confronted with difficult adult issues prematurely.

On February 15, 2005, R.O. sent a letter to Superintendent Pastel appealing Principal Wilson's denial of his appeal. Pastel upheld the decisions of Vinch and Wilson, stating:

> The stick figures are explicitly shown in various positions of sexual intercourse. As such, they appeal to the prurient interest in sex . . . . Further, they are patently offensive in that they depict the ultimate sex act. . . . [U]nder *Hazelwood* or *Tinker*, the right of the District to control what is published in the school newspaper is not limited to material that is obscene. The cartoon will substantially interfere with the work of the school and impinge upon the rights of other students. Distribution of this offensive cartoon to all students would clearly offend many students. Please recall that the high school includes ninth graders. The mockery made of sexual intercourse in the stick figures would raise inappropriate questions in the minds of many immature students and interfere with what is being taught in the health curriculum regarding both responsibility and abstinence.

On March 3, 2005, R.O. requested permission from Assistant Superintendent Russell to distribute *The March Issue*, an independent student publication (*i.e.,* one not subsidized by the school) that had been newly created by *The Tattler*'s editors. The second page of *The March Issue* contained the same stick-figure cartoon, this time accompanying an article that discussed ICSD's censorship of *The Tattler*. On March 8, 2005, Superintendent Pastel sent a letter to R.O. denying permission to distribute *The March Issue* on ICSD grounds, explaining:

> As you are aware, [*The March Issue*] includes the cartoon that is the subject of *The Tattler*'s current appeal. I have concluded that distribution of this cartoon would cause material and substantial interference with the educational operation of Ithaca High School. The cartoon is unfit for distribution to students in the High School.

7

On March 9, 2005, in response to a second challenge by R.O., Pastel reconfirmed her decision not to allow distribution of *The March Issue*, stating:

> I believe that the cartoon at issue is obscene, and further that its distribution would be offensive to many students and confusing to others, particularly immature students whose understanding of and views about sexual relations are not fully formed. Further, its distribution would interfere with teaching of the current health curriculum, in particular that sexual relations is a matter to be taken seriously.

The student editors of *The March Issue* subsequently created two more independent newspapers entitled *The April Issue* and *The May Issue*, neither of which contained the stick-figure cartoon. The editors received permission to distribute both publications on ICSD grounds.

On May 11, 2005, a new Faculty Advisor was appointed to oversee *The Tattler*. Thereafter, publication of *The Tattler* proceeded normally; there were no further efforts to publish the stick-figure cartoon.

## C. Plaintiffs' Lawsuit and the District Court's Judgment

On June 3, 2005, plaintiffs filed suit alleging violations of their rights under the First and Fourteenth Amendments. On March 23, 2009, the District Court granted partial summary judgment in favor of defendants. In its Memorandum Decision and Order, the District Court held that *The IHS Tattler* qualified as a "limited public forum," and, therefore, that its contents were subject to "reasonable and viewpoint neutral" restrictions. *See Hotel Emps. & Rest. Emps. Union Local 100 v. N.Y.C. Dep't of Parks & Rec.*, 311 F.3d 534, 545-46 (2d Cir. 2002). Next, the Court held, pursuant to *Fraser* and *Hazelwood* that ICSD's refusal to publish a sexually explicit cartoon in *The IHS Tattler* was reasonable and viewpoint-neutral because the cartoon was lewd and conflicted with the school's legitimate pedagogical concerns. Third, the Court held, pursuant to *Tinker*, 393 U.S. at 506, that ICSD's refusal to distribute *The March Issue* was reasonable and viewpoint-neutral because distribution of the cartoon would materially and substantially disrupt the classwork and discipline of the school.

8

Finally, the District Court denied summary judgment in favor of defendants with respect to plaintiffs' claims for a declaratory judgment and for an injunction against enforcement of the Guidelines, because defendants presented only cursory arguments in favor of the Guidelines, which the Court deemed inadequate to demonstrate that the defendants were entitled to judgment on that question as a matter of law.

This appeal followed.[3]

## DISCUSSION

### I.

On appeal, plaintiffs argue that the District Court erred in holding that *The IHS Tattler* qualified as a "limited public forum." We disagree.

The level of scrutiny applied to a restriction on speech depends upon the nature of the forum in which the speech occurs. Fora for expression are classified into four categories, which fall along a spectrum extending from those deserving the greatest constitutional protection to those deserving the least constitutional protection: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum. *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004). A limited public forum is created when the state "opens a non-public forum but <u>limits</u> the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Emps. & Rest. Emps. Union Local 100*, 311 F.3d at 545 (quotation marks omitted) (emphasis supplied). That is precisely the situation presented here. Although *The Tattler*'s written submissions were not restricted to ICSD's current students, and although the paper was distributed at certain off-campus locations, there is no evidence that ICSD invited all types of expressive activity in *The Tattler*, including speech otherwise inappropriate for a student audience.

---

[3] As explained *ante* note 1, plaintiffs submitted a motion for certification of the partial judgment pursuant to Fed. R. Civ. P. 54(b), which the District Court granted on January 26, 2010.

Since at least 1979, *The Tattler* has never operated without a Faculty Advisor overseeing the production of the newspaper and providing guidance to the student editors. Indeed, when *The Tattler's* Faculty Advisor resigned on February 3, 2005, the editors were not permitted to produce another issue until a new Faculty Advisor was appointed. Although plaintiffs dispute the proposition that the Faculty Advisor had "final say" over the content of the newspaper, it is undisputed that the Faculty Advisor and school administration exercised a substantial degree of control over the paper's creation and content. For example, Eileen Bach, the Faculty Advisor from 1992 to 2003, refused to allow the publication of a story concerning the arrest of a teacher, met with parents regarding inappropriate conduct by certain staff members, and fired three editors for attempting to publish insults about their classmates disguised in an illegible typeface. In addition, Faculty Advisor Vinch, who served from 2003 to 2005 (including the period in which the censorship alleged here took place), required students to submit a final proof set of each issue of *The Tattler*, which she reviewed and altered and which could not be sent to the printer without her approval. On one occasion, when students skirted this requirement by inserting an inappropriate personal ad into the final printed version of the May 2004 issue, she cancelled the last issue of the paper for the 2003-2004 academic year.

While ICSD apparently opened the newspaper to *some*—or even *many*—types of speech, there is no evidence that the school permitted "indiscriminate use by the general public," as is required to create a traditional public forum or designated public forum. *Hazelwood*, 484 U.S. at 267; *see also Hotel Emps. & Rest. Emps. Union Local 100*, 311 F.3d at 545 (stating that a designated public forum is one intentionally "opened for <u>all types</u> of expressive activity" (emphasis supplied)). Rather, the school confined the paper to content consistent with a supervised, age-appropriate learning experience for student editors and high school readers. In sum, we agree with the District Court that the *IHS Tattler* is a limited public forum. *See R.O v. Ithaca City Sch. Dist.*, No. 5:05-CV-695, at 20-24 (N.D.N.Y. Mar. 23, 2009).

In a limited public forum, the government may restrict speech in a way that is viewpoint-neutral and reasonable in light of the forum's established purpose. *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005). Plaintiffs argue that the District Court erred in holding that ICSD could require review of *The Tattler*'s content by a Faculty Advisor and could refuse to publish a sexually explicit cartoon. Substantially for the reasons stated by the District Court, *see R.O. v. Ithaca City Sch. Dist.*, No. 5:05-CV-695, at 31-46, we hold ICSD's actions were a lawful means of avoiding publication of lewd material and material that conflicts with the school's legitimate pedagogical concerns. *See Fraser*, 478 U.S. 675; *Hazelwood*, 484 U.S. 260.

The standards enunciated by the Supreme Court for assessing whether a school's censorship of student speech is constitutionally permissible can be distilled into four basic principles. We noted three of the four in *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320 (2d Cir. 2006), which held that a school could not punish a student for wearing a T-shirt depicting a martini glass and "lines" of cocaine next to an image of George W. Bush. First, under *Fraser*, "schools have wide discretion to prohibit speech that is less than obscene—to wit, vulgar, lewd, indecent or plainly offensive speech." *Id.* at 325. Next, under *Hazelwood*, speech that is "school-sponsored" may be censored "so long as the censorship is reasonably related to legitimate pedagogical concerns." *Id.* Third, under *Tinker*, "speech that is neither vulgar, lewd, indecent or plainly offensive under *Fraser*, nor school-sponsored under *Hazelwood* . . . may not [be] regulate[d] . . . unless it would materially and substantially disrupt classwork and discipline in the school." *Id.*[4] Finally, in 2007 (after *Guiles*), the Supreme Court decided *Morse v. Frederick*, 551 U.S. 393 (2007), which held that schools may restrict student speech that they

---

[4] As we have recently observed in *Doninger v. Niehoff,* __ F.3d __, No. 09-1452-cv (L), 2011 U.S. App. LEXIS 8441, at *51 (2d Cir. Apr. 25, 2011), "it is not entirely clear whether *Tinker's* rule (as opposed to other potential standards) applies to all student speech not falling within the holdings of *Fraser, Hazelwood,* or *Morse* [*v. Frederick*, 551 U.S. 393 (2007)]." We need not address that question, however, because ICSD's conduct is permissible under *Fraser* and *Hazelwood*, as we explain below.

"reasonably [ ] regard[ ] as encouraging illegal drug use." *Morse*, 551 U.S. at 397.

The censored cartoon that is in the record before us contains drawings of stick figures in various sexual positions and is unquestionably lewd. *See Guiles*, 461 F.3d at 327 (defining "lewd" as "inciting to sensual desire or imagination") (quoting *Merriam Webster's Third New Int'l Dictionary* 1147 (1st ed. 1981)); *see also id.* (describing lewd, vulgar, and indecent expression as "speech that is something less than obscene but related to that concept, that is to say, speech containing sexual innuendo"). Accordingly, the District Court did not err in finding that the rule of *Fraser* applied to the instant case and that the school acted lawfully in censoring the cartoon and choosing to have future submissions reviewed by a Faculty Advisor.

Nor did the District Court err in determining, as an alternative basis for its holding, that ICSD's actions were protected under *Hazelwood*. Notwithstanding plaintiffs' attempts to characterize *The Tattler* as "a student-run newspaper, not a school-sponsored one," the record clearly demonstrates that the paper was school-sponsored, or at least that its publication constituted an "expressive activit[y] that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," which is sufficient to trigger the application of *Hazelwood*. *See Hazelwood*, 484 U.S. at 271; *accord Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994) (applying *Hazelwood* to conclude that the conduct of a voluntary "guest lecturer" bore the imprimatur of the school because "the lecture took place in a traditional classroom setting and was designed to impart knowledge to the student participants."). For example, it is undisputed that ICSD's name and insignia—its physical imprimatur—was printed on *The Tattler*'s masthead and that ICSD provided, among other means of support, the following resources: a budget for postage, printing, and publication costs; an office inside IHS and money for all expenses related to the maintenance and operation of the office; computer equipment, phone lines, internet access, office furniture, and some office supplies; funding to attend student journalism conferences; and payments

12

for the paper's insurance coverage.  ICSD also paid a teacher to act as Faculty Advisor, and the paper was never published without an Advisor overseeing it.  Finally, members of the community at large apparently believed that *The Tattler* was school-sponsored: in January 2005, for instance, a restaurant that had been the subject of negative news coverage in *The Tattler* directed its complaint letter to ICSD, *not* to the newspaper's student managers.

Under *Hazelwood*, school-sponsored speech may be censored "so long as the censorship is 'reasonably related to legitimate pedagogical concerns.'"  *Guiles*, 461 F.3d at 325 (quoting *Hazelwood*, 484 U.S. at 273).  The District Court correctly concluded that ICSD authorities acted lawfully under this standard.  Among other things, in the weeks during and just prior to the period in which students sought to publish the objectionable cartoon, school authorities became aware that an increasing number of students were engaging in risky sexual behavior.  The problem became so severe that Superintendent Pastel and Principal Wilson wrote a letter to all ICSD parents informing them of the school district's concerns.  In an affidavit submitted to the District Court, Pastel asserted: "[I]t was the District's position that printing a drawing that makes light of sexual relations and mocks the ICSD's health education program in an ICSD publication would undermine the District's concerted effort to stress to students and parents the seriousness of sexual relations . . . [and that] sex can often be a matter of life and death."  Therefore, ICSD's actions were proper under *Hazelwood*, and plaintiffs' claims to the contrary are without merit.

### III.

When plaintiffs were prevented from producing the March 2005 issue of *The Tattler* due to the lack of a Faculty Advisor, they financed and produced an independent student newspaper, *The March Issue*.  Plaintiffs sought permission from the School Superintendent to distribute the paper on campus (as required by the ICSD Student Conduct Manual), but the Superintendent refused on the basis that

13

the paper contained the same stick-figure cartoon that school authorities had deemed inappropriate for publication in *The Tattler*.

The District Court ruled ICSD's actions were lawful under *Tinker* because school authorities had determined that the cartoon would "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513. Plaintiffs argue that only one case in our Circuit has ever applied the *Tinker* rule to permit censorship of a student publication, *see Trachtman v. Anker*, 563 F.2d 512 (2d Cir. 1977), and that *Trachtman* is distinguishable because the plaintiffs there were using their publication to invade the privacy of other students by obtaining information about their sexual preferences, not simply attempting to publish a sexual cartoon. Plaintiffs also assert that when "the cartoon [ ] did reach the hands of IHS students through the off-campus distribution of *The March Issue*, there is no record that any disruption of the work or discipline of the school ensued."

We need not reach the question of whether ICSD's conduct was lawful under *Tinker*, because its conduct was lawful under *Fraser*. Although the Supreme Court has not clarified the extent to which the *Fraser* doctrine applies in contexts beyond the facts of that case—specifically, beyond those situations in which a student speaker at a school assembly uses lewd language, *see Fraser*, 478 U.S. at 677—we have not interpreted *Fraser* as limited either to regulation of school-sponsored speech or to the spoken word. *See, e.g., Guiles*, 461 F.3d at 325 (stating that schools "have wide discretion to prohibit speech" under *Fraser* and holding that *Fraser* did not protect the school's prohibition of Guiles' George W. Bush T-shirt (*i.e.*, a written, non-school-sponsored message) only because the T-shirt was not "as plainly offensive as the sexually charged speech considered in *Fraser* . . . especially when considering that [it was] part of an anti-drug political message"); *Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008) (stating that a student's off-campus Internet posting calling school administrators "douchebags" could have been prohibited under *Fraser* if it had occurred on-campus); *see also Saxe v. State Coll. Area Sch. Dist*, 240 F.3d 200, 214 (3d Cir. 2001) ("To summarize: Under *Fraser*, a school may

14

<u>categorically</u> prohibit lewd, vulgar, or profane language."(emphasis supplied)); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992) (concluding the suppression of all vulgar, lewd, obscene, and plainly offensive speech in a public school is reviewed under *Fraser*, whereas school-sponsored speech may be reviewed under *Hazelwood*).

As explained above, drawings of stick figures in sexual positions clearly qualify as "lewd"—that is, "inciting to sensual desire or imagination." *See Guiles*, 461 F.3d at 327 (quoting *Merriam Webster's Third New Int'l Dictionary* 1147 (1st ed. 1981)). Accordingly, we hold that ICSD authorities acted reasonably under *Fraser* in preventing the distribution of *The March Issue* at Ithaca High School.

## CONCLUSION

In sum:

(1) defendants lawfully prohibited the publication of a sexually-explicit cartoon in *The IHS Tattler*, pursuant to the standards for regulation of speech set forth in *Bethel School District Number 403 v. Fraser*, 478 U.S. 675, 683 (1986), and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988);

(2) defendants lawfully prohibited the on-campus distribution of a sexually-explicit cartoon in the independent student newspaper *The March Issue*, pursuant to *Fraser*; and

(3) in these circumstances, we need not reach the question of whether defendants' prohibition of the on-campus distribution of *The March Issue* was lawful under *Tinker*.

We have considered all of plaintiff's arguments and find them to be without merit. Accordingly, for the reasons stated above, we **AFFIRM** the judgment of the District Court.