TC and KC, individually and as parents of DC, Plaintiffs,

v.

VALLEY CENTRAL SCHOOL DISTRICT; Valley Central School District Board of Education; Richard M. Hooley, Individually and as Superintendent of the Valley Central School District; Joanne Avella, individually and as former Principal of Valley Central High School; Dr. Debra M. Lynker, individually and as former Interim Principal of Valley Central High School; Thomas Balducci, individually and as Vice Principal of Valley Central High School; Joseph DiMaio, individually and Vice Principal of Valley Central High School; Brian Giudice, individually and former Vice Principal of Valley Central High School; Glenn Taylor, individually and as Guidance Counselor of Valley Central High School; Major Robert "BOB" Bouldin, individually and as Senior Army Instructor of Valley Central JROTC; Sergeant Patrick T. Wimmer, Individually and as Army Instructor of Valley Central ROTC; and Unknown Students 1–100; Unknown Teachers 1–100; Unknown Administrators 1–100; Unknown Lunch Aides 1–100, the exact names and identities of whom are not presently known, Defendants.

No. 7:09–cv–9036 (WWE).

United States District Court, S.D. New York.

March 30, 2011.

**583**

Giulia Frasca, Peter David Hoffman, Law Office of Peter D. Hoffman, PC, Katonah, NY, for Plaintiffs.

Adam I. Kleinberg, Leo Dorfman, Sokoloff Stern LLP, Westbury, NY, for Defendants.

### MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS

WARREN W. EGINTON, Senior District Judge.

Plaintiffs TC and KC, individually and as parents of DC, bring this action stemming from their son's experiences at Valley Central High School. Defendants have filed two motions to dismiss, one by defendant Avella (Doc. # 30) and one by the remaining defendants (Doc. # 27). In their response, plaintiffs included a request to amend their complaint, submitting the proposed amended complaint as an exhibit. For the following reasons, the motions to dismiss will be granted in part,

and the motion to amend the complaint will be granted to the extent that the amendments will not be futile.

The Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 as to plaintiffs' federal law claims and 28 U.S.C. § 1367(a) as to plaintiffs' state law claims.

## BACKGROUND

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the Court accepts all allegations of the amended complaint as true.

DC is a minor and a resident of Walden, New York. He was born on October 10, 1991 and turned eighteen years old on October 10, 2009.[1] TC and KC are DC's father and mother, respectively. At all times relevant to this action, he was enrolled at the Valley Central High School. DC was diagnosed with severe ADHD at age 5 and has been on a Rehabilitation Act 504 Plan since seventh grade. His grades and behavior are indicative of a student who has difficulties due to his disability.

Defendant Valley Central School District ("School District" or "VCSD") is the local school district. Defendant Richard M. Hooley is VCSD's Superintendent of Schools. Defendant Joanna Avella was formerly the principal of Valley Central High School ("VCHS"). Defendant Dr. Debra M. Lynker was formerly Interim Principal of VCHS. Defendants Thomas Balducci and Joseph DiMaio are Vice Principals of VCHS. Defendant Brian Giudice was formerly Vice Principal of VCHS. Defendant Glenn Taylor is a guidance counselor at VCHS. Defendant Major Robert Bouldin is a Senior Army Instructor and defendant Sergeant Patrick T. Wimmer is an Army Instructor of Valley Central JROTC located within VCHS.

In May 2008, DC was reprimanded by Major Bouldin for reading *Mein Kampf.* DC was reading the book because of his interest in military affairs and for a class that he was taking on military history. Vice Principal Giudice had the lock on DC's locker cut without DC's knowledge because he suspected that DC had drawings of German military symbols in his locker. Nothing was found, and there was no write-up of these events placed in DC's record.

In response, plaintiffs had a meeting with Giudice and Bouldin to ask why Giudice had not asked DC to open his locker. At this meeting, TC placed the School District on notice that he believed that it was wrongfully discriminating against DC, harassing him and violating his First Amendment rights. TC told Giudice and Bouldin that it was DC's parents' role to monitor what their son was reading, not the school's. TC pointed out that DC got the book from the school library, not from home.

On October 28, 2008, DC was confronted by a minority student DS in an aggressive, unprovoked manner in the cafeteria during his eighth period lunch. While going to his next class, DC was confronted by several minority students, including DS and WB, acting in an aggressive manner. They called DC "whiteboy," "cracker" and other derogatory names and threatened to beat him up and to kill him and KC. This incident occurred in the presence of two faculty hall monitors and science teacher Anna Leo as well as several students, including KG and KM. DS and WB pursued

---

1. DC's birthday was not included in the complaint and is taken from plaintiffs' petition to file a late notice of claim. The Court may review the notice of claim without converting the motion into one for summary judgment because it is referenced in both the amended complaint and the proposed amended complaint. *See Obilo v. City Univ. of N.Y.,* 2003 WL 715749, *2 n. 8, 2003 U.S. Dist. LEXIS 2886, *8 n. 8 (E.D.N.Y. Feb. 28, 2003).

DC even after he was pulled into a classroom by Leo and the door was locked. Vice Principal Balducci made DC write up the events in the cafeteria and the hallway. Plaintiffs have never been provided with a copy or an opportunity to review DC's write-up, despite requests to do so. Only the events in the cafeteria were disclosed to DC's parents; what transpired in the hallway was not. Following the incident, Balducci and Principal Avella accused DC of using a racial epithet regarding the minority students. DC denied using any racial slurs or epithets directed towards the students who threatened him in the cafeteria and hallway. DC did acknowledge saying in the cafeteria, "what are the black kids laughing at."

In Avella's office that day, Avella spoke to DC about how the use of the word "black" may be both inflammatory and derogatory and how it was inappropriate to classify people in that manner. She urged DC to refrain from using the word. Neither Balducci nor Avella commented on the use of the words "whiteboy" or "cracker" directed at DC. No incident report was written up regarding these events.

The next day, on October 29, TC and the parents of KG and KM, two white students who had witnessed the incidents, came to the school to speak with Avella. Avella told TC that no one would be punished for the October 28 incident; that the school had taken steps to curb further inappropriate behavior; and that she expected all parties involved to stop any escalation or they would face strict discipline. Balducci told TC and DC that they would "bring down the hammer" if any further incidents occurred.

During the meeting, Avella stated:

My heart goes out to the people who were oppressed for 200 years. You can't possibly know what it's like to be a person of color in America today.... Your ideas and morals are disgusting and anyone who believes in the things you do is a despicable human being.... I have a white supremacist in my family. He's a complete hypocrite and ruins our holidays. We have to argue with him over the fact that he admires a black man he works with.

TC told Avella that although DC may have had some behavioral issues that year, his issues had nothing to do with race.

During the meeting, Vice Principal Millicent Lee, who is African–American, confirmed that she had never had any issues regarding DC. Avella then stated that "Jesus was from one of the darker tribes of Israel; Scripture says he had hair like wool. Therefore, he was most likely black." Avella did not respond when TC asked her what that had to do with the matters at hand. As TC and DC were leaving the office, Avella remarked to DC, "Your blonde hair and blue eyes won't do you any good in prison. They'd toss you like a salad!"

On October 30, Officer Kenneth Byrnes of the Town of Montgomery Police Department who was assigned to the VCHS as a school resource officer pulled DC out of class and told him that he should not attend the football game Friday night because there were rumors of retaliation threatened against him. Byrnes told KG, a white student who had witnessed the October 28 incident, the same thing. Balducci called TC at home and told him that the administration had heard rumors about retaliation if DC attended the Friday football game. TC expressed his concern on how the administration was handling the situation.

On Friday October 31, TC requested a meeting with Avella and Bouldin; Wimmer attended in Bouldin's stead. TC again expressed his concern about the manner in which the October 28 incident and the retaliation threats were being handled.

TC further remarked that the minority students involved in the incidents were on the football team and questioned whether the upcoming game played a role in the administrators' decision not to punish them.

After TC left, Avella left a message on plaintiffs' home answering machine stating that DC had been brought into the office. DC was kept there until the end of the school day with no clear explanation. He was not allowed to call his parents despite numerous requests to do so. DC was told that he was being kept in the office for his safety. Plaintiffs received a written referral indicating that DC had been followed between classes and would be punished if he continued his "aimless wandering." This referral was not in DC's official school record. While in the office, DiMaio told DC that he should go home. Avella told DC that "your opinions are not equal to ours, maybe they will be when you have a degree, until then you have no right to question myself or Mr. DiMaio."

When DC went to the school bus that day, two minority students who had been involved in the October 28 incident stood outside the bus taunting DC to get off the bus and fight. This was witnessed by Balducci who told the two students to move on.

After finding out about this, TC called Balducci and questioned why there had been no further discipline. Balducci's responded was that there was another incident down the bus line that needed his attention. When TC went to school the following Monday, Avella told him that she had not been notified of the bus incident.

On December 5, 2008, DC was found in possession of the lyrics of a rap song which he and a friend, JR, wrote at home. DC had brought a copy of the song to school to give to JR. According to the Discipline Referral written by Bouldin dated December 5, Bouldin had reviewed the document and noticed several "racial statements." When confronted with the document, DC stated that they were song lyrics.

According to Avella's letter to plaintiffs dated December 5, plaintiff DC was "exhibiting disruptive behavior" while he "observed during first period class, showing students containing racial slurs, epithets, and inflammatory remarks" in violation of the School District's Code of Conduct and the High School Discipline Code. As a result, DC was suspended from December 8 until December 12, although the suspension actually began on December 5 at 8:00 a.m. before TC and KC received written notice of it.

The suspension had lasted six days before the Superintendent suspended DC for the remainder of his senior year. A letter dated December 5 notified TC and KC that they had a right to request an "immediate informal conference with the high school administration." It did not inform them of their right to question the complaining witnesses. Plaintiffs do not believe that JR was questioned by school officials or punished in any manner.

In a memorandum sent from Avella to the Superintendent asking for a hearing, she referred to the October 28 incident. Plaintiffs allege that this reference biased the Superintendent before the hearing began.

On December 11, a hearing was held in which DC pled not guilty to charges that:

(1) he disrupted the classroom when he passed a document to another student in JROTC class; and (2) he created a situation that led school authorities to reasonably forecast a substantial disruption, when he passed a document containing racially-charged and hostile language to another student and/or left the document in a location where it was accessible to others.

At the conclusion of the hearing, TC remarked that he knew that DC had numerous referrals in his past due to his disability. All that he wanted, TC commented, was for the school to be fair. Superintendent Hooley responded, "life isn't fair."

As of December 5, 2008, DC's 504 Plan had not been reviewed or updated since seventh grade despite his having received numerous Fs and discipline referrals for disability-related behavior. At no time did School District administrators suggest adding a behavior modification plan to DC's 504 Plan or suggest any meetings with the school psychologist or that any further educational evaluations be conducted. Instead, the School District used punishment to handle DC's behavior. DC has been told by various teachers over the years that there is no such thing as ADHD and that he does not have ADHD.

On December 11, the matter was referred to the 504 Committee for a Manifestation Determination to review whether the December 4 incident was due to DC's disability. This referral was made after the school's presentation of its case against DC in the Superintendent's hearing, but before the Superintendent had notified plaintiffs of his determination of guilt.

Plaintiffs received no prior written notice of the Manifestation Determination meeting to be held on December 12 at 10:00 a.m. Instead, they were notified by phone on the afternoon of December 11, after they had left the school. They had no time to prepare or obtain pertinent records.

Plaintiffs allege that the Manifestation Determination was a sham based on an inadequate and outdated evaluation of DC done before he had entered the VCSD, more than eight years earlier. Plaintiffs were not provided with a notice of their 504 due process and procedural rights and were not given an opportunity to review DC's records. Plaintiffs claim that the he

only person at the hearing who may have had some understanding of the effects of ADHD on DC's behavior was the school psychologist. She admitted that she had never met DC. No special education teacher was present.

There was no formal reevaluation conducted by the Committee to which plaintiffs were privy. Plaintiffs claim that the meeting was a rehashing of the charges against DC and a cursory review of his 504 plan. The plan had been reviewed and updated to include a behavior modification element prior to the start of the meeting. No formal determination had been reached by the Committee while plaintiffs were present. Plaintiffs were told to leave, and they later received a telephone call at 12:30 p.m. that day. They were advised that the Committee had found no nexus between DC's disability and the rap song incident.

Plaintiffs allege that the "no nexus" decision had been made when the committee had reconvened with Avella present. By that time, TC and KC participated via telephone. No behavior modification plan was implemented due to DC's suspension.

Plaintiffs were never informed of the reasons for the committee's determination. When they received the written report, they noticed numerous inaccuracies and misstatements. TC informed DiMaio of the inaccuracies and misstatements, but he refused to make any corrections.

On December 22, Hooley indicated that he had also considered DC's anecdotal record as well as his "history and notoriety in the school" which "reasonably forecasts a substantial disruption based on the racially charged and hostile language in the document." Plaintiffs allege that the December 22 letter from Hooley suggests that DC is a racist, white supremacist, bigot and a liar. In making his determination, Hooley considered statements made dur-

ing the hearing by Avella regarding the October 28 incident which were never officially reported or investigated. Plaintiffs allege that Wimmer lied under oath when he claimed that DC had used the word "nigger" in October, even though he had no direct knowledge of it and no write-up of the incident had been done. Bouldin claimed, without providing factual basis for his comments, that the rap lyrics that DC wrote represented how DC actually thought and felt. Bouldin was also permitted to introduce the *Mein Kampf* incident even though it was not in DC's record.

DC had been enrolled in JROTC at VCHS for four years and was considering a commissioned career in the military when he finished school. When he was suspended, he was forced to drop out of the JROTC program.

By letter dated January 13, 2009, plaintiffs were advised that the Board of Education, without explanation, denied the appeal and upheld the Superintendent's decision.

Following DC's suspension, he was examined by a psychiatrist. The psychiatrist concluded that DC is not a racist and that his song was not intended to be a racial slur or epithet or derogatory in any manner.

After January 2009, TC contacted the school numerous times to (1) obtain additional school records; (2) clean out DC's locker; (3) obtain and return school work as necessary for DC to get his diploma; and (4) request a math tutor. TC was told that DC could drop math because he would not need it to graduate, and his requests for a tutor were denied. On April 20, TC requested that the Superintendent reconsider his decision. Such request was denied.

In February 2009, a death threat against DC was written on a bathroom wall in the school. Plaintiffs were never advised of this threat, despite Wimmer discovering and reporting it on February 10. Custodians cleaned off the graffiti threat from the bathroom wall. Later, the identical threat reappeared in the same place, and DC was informed of this second threat by another student.

On April 27, TC reported the second threat to Glenn Taylor, a guidance counselor, and, on April 28, to Montgomery Police Officer Kenneth Byrnes. Once Byrnes verified the threat, he indicated that he would put the matter on his "blotter." Only after repeated urging by plaintiffs was a formal police report filed on May 21. Plaintiffs are not aware of any official police investigation. Byrnes indicated in his report that he was "unable to locate any suspects" and that the case was closed. Byrnes also noted that custodians had cleaned off the threat.

In early May, Hooley told plaintiffs that he would give DC a tutor six hours per week. This was after he had denied DC a tutor, most recently on April 24.

On May 14, plaintiffs wrote to Dr. Debra Lynker, Interim Principal of VCHS regarding the threats and the October 2008 incident. On May 22, plaintiffs met with Lynker to discuss their letter. Counsel for plaintiffs and the School District were also present. It was at this meeting that plaintiffs found out about the February 2009 threat.

On June 1, plaintiffs wrote to Lynker to inquire about the status of the investigation. On June 11, Lynker advised plaintiffs that an investigation had been done. She informed plaintiffs that the area is being monitored using the word "graffiti" instead of "threat."

In June 2009, plaintiffs sent Hooley a letter regarding an incident involving their daughter who was in sixth grade.

Plaintiffs assert claims for defamation; violation of DC's First Amendment rights;

reverse discrimination under Title VI of the Civil Rights Act of 1964; violations of the New York Human Rights Law; violations of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, and the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.;* intentional infliction of emotional distress; negligent supervision; hostile education environment; and negligence per se regarding federal hate crime prevention.

## DISCUSSION

The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff is obliged to amplify a claim with some factual allegations to allow the court to draw the reasonable inference that the defendant is liable for the alleged conduct. *Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The Court will first address defendants' contentions regarding plaintiffs' standing to assert claims on behalf of their son, before addressing defendants' substantive arguments in favor of dismissal.

## I. Plaintiffs' Standing

The doctrine of Article III standing requires litigants to demonstrate that (1) they suffered actual or threatened injury as a result of the illegal conduct of the defendants, (2) the injury is fairly traceable to the challenged action, and (3) the injury is redressable by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The harm to plaintiffs must be actual or imminent, not conjectural or hypothetical. *Port Washington Teachers' Ass'n v. Bd. of Educ. of the Port Washington Union Free Sch. Dist.,* 478 F.3d 494, 498 (2d Cir.2007). Beyond those constitutional requirements, there are certain court-imposed limits to invoking the jurisdiction of the federal courts. Specifically, "[t]he plaintiffs must (1) be asserting [their] own legal rights, and not those of a third party, (2) be asserting, in addition to a redressable injury, a particularized grievance, and (3) be asserting a claim that falls within that zone of interests the statute aims to protect or regulate." *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 58 (2d Cir.1994).

Generally, plaintiffs may only assert their own rights. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("A federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action."). Jurisdiction cannot be invoked solely on the basis of harms to a member of plaintiffs' family, unless the real party-in-interest is a minor whose interest in a litigation is brought through a representative individual as set forth in C.P.L.R. § 1201. *See, e.g., Morgan v. City of New York,* 166 F.Supp.2d 817, 819 (S.D.N.Y.2001) (dismissing section

1983 claim that mother had right for her child to receive a public high school education); *Burton v. City of New York,* 1997 WL 793105, 1997 U.S. Dist. LEXIS 19946 (E.D.N.Y. Nov. 28, 1997) (granting motion to dismiss where plaintiff asserted claims on behalf of his wife).

■ Plaintiffs do not object to defendants' argument regarding standing. Rather, they seek to amend the complaint to permit DC to assert claims on his own behalf, in addition to the claims that TC and KC assert as individuals. Federal Rule of Civil Procedure 15(a) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." Fed.R.Civ.P. 15(a). As the Supreme Court has held, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). A district court may deny leave for "good reason" such as futility, bad faith, undue delay, or undue prejudice to the opposing party, but "outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200–01 (2d Cir.2007).

■ Plaintiffs TC and KC assert no claims for physical injuries that they personally suffered or for violations of their constitutional or statutory rights. Instead, their claims are asserted through injuries allegedly suffered by their son DC. The Court will allow plaintiffs to amend their complaint to permit DC to assert claims on his own behalf as he is not a minor and was not one when this action was commenced.

■ The sole remaining claim asserted by TC and KC in the proposed amended complaint is an emotional distress claim. The Restatement (Second) of Torts § 46 recognizes that a claim for intentional in-fliction of emotional distress may lie where extreme and outrageous conduct is directed at a third person and the plaintiff is present at the time of the triggering event. Restatement (Second) of Torts § 46(2)(a) & cmt. *l* (1965); *but see Garland v. Herrin,* 724 F.2d 16, 19 (2d Cir. 1983) (questioning whether New York courts recognize bystander theory on a claim for intentional infliction of emotional distress). The Court need not decide whether New York courts recognize a claim for intentional infliction of emotional distress upon a bystander theory at this stage. Rather, the Court will dismiss the intentional claim as to KC because there is no allegation that she was present at any meeting in which the alleged emotional distress arose except for the December 12 conference. *See Jackson v. Kump,* 1994 WL 9691, 1994 U.S. Dist. LEXIS 255 (S.D.N.Y. Jan. 13, 1994). Even if KC could maintain a cause of action for intentional infliction of emotional distress based on that conference, defendants' conduct there does not arise to the level of "extreme" or "outrageous." *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999). As to TC's claim, the Court will address it when it substantively addresses the emotional distress claim.

The Court will address each of the remaining amendments to the proposed amended complaint below.

## II. First Amendment Claim

The second count of the complaint alleges that defendants violated DC's First Amendment rights when he was punished for possessing his rap song. He alleges that the school's speech policy is overly broad and vague.

■ "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Students in public schools, however, enjoy a more limited form of First Amendment protection than do adults in society at large. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."). A school must demonstrate more than a "mere desire" to avoid "discomfort and unpleasantness" to censor a form of expression. *Wisniewski ex rel. Wisniewski v. Bd. of Educ.,* 494 F.3d 34, 38 (2d Cir.2007). Rather, for a school to suppress student expression, school officials must reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school," *Morse v. Frederick,* 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), or that the speech is inconsistent with its "basic education mission." *Fraser,* 478 U.S. at 685, 106 S.Ct. 3159. Officials may curtail student expression when they "might reasonably portend disruption from the student expression at issue;" there need not be any actual disruption. *Doninger v. Niehoff,* 527 F.3d 41, 51 (2d Cir.2008).

Courts recognize that the administrators should be given leeway to address any potential disruption before it manifests itself. *See Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("It is not the role of the federal courts to set aside decision of school administrators which the court may view as lacking a basis in wisdom or compassion."); *Doninger,* 527 F.3d at 51 ("[Plaintiff's] argument is misguided insofar as it implies that *Tinker* requires a showing of actual disruption to justify a restraint on student speech"); *DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F.Supp.2d 461, 481 (E.D.N.Y.2009), *aff'd,* 623 F.3d 71 (2d Cir. 2010), *cert. denied,* 2011 WL 162835, 2011

U.S. LEXIS 1809 (Feb. 28, 2011); *LaVine v. Blaine Sch. Dist.,* 257 F.3d 981, 989 (9th Cir.2001) ("*Tinker* does not require school officials to wait until disruption actually occurs before they may act."); *see also Cuff v. Valley Cent. Sch. Dist.,* 714 F.Supp.2d 462, 469 (S.D.N.Y.2010) ("Under *Tinker,* it is the objective reasonableness of the school administrators' response, rather than the student's private intentions, that are relevant.").

DC's "song lyrics" were not quoted in the complaint. Instead, Avella included them as an exhibit to her motion to dismiss. Plaintiffs do not challenge Avella's submission and responded on the merits to her arguments. The Court will review the lyrics because they are integral to plaintiffs' complaint and the parties do not dispute the accuracy or authenticity of Avella's submission. *See Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808–09 (2d Cir.1996); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 273 F.Supp.2d 351, 356–57 (S.D.N.Y.2003) (listing materials that may be reviewed in deciding a Rule 12(b)(6) motion, including documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, and documents contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint.).

In his song, DC talks about shooting "niggas" and makes other racial references. The lyrics are often violent and vulgar and include graphic descriptions of violence. Defendants would have the Court compare the song lyrics to the statements addressed in *Wisniewski* and *D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.,* 386 F.Supp.2d 119 (E.D.N.Y.2005), *aff'd,* 180 Fed.Appx. 232 (2d Cir.2006). In *Wis-*

*niewski*, the plaintiff posted a small icon on his online messaging service that included a drawing of a pistol firing a bullet at a person's head with the words "Kill Mr. VanderMolen," who was plaintiff's English teacher at the time. The icon was displayed for three weeks. The district court found that the icon could reasonably be interpreted as a true threat. Finding that it was not entitled to First Amendment protection, the court granted summary judgment. The Court of Appeals affirmed, not on the grounds that the icon constituted a true threat, but because there was a reasonably foreseeable risk that it would materially and substantially disrupt the work of the school.

In *D.F.*, a student was suspended for five days after he kept a journal that included a fictional story about a boy who goes on a killing spree. Some of the characters in the story shared names with actual classmates of D.F. D.F. had no prior disciplinary history at the time. The district court granted a Rule 12(b)(6) motion on the grounds that the journal "may materially interfere" with the school's work and that the story constituted a true threat.

A third relevant precedent is the case of *Cuff v. Valley Cent. Sch. Dist.* In that case, a fifth-grade student was suspended after he filled in a picture of an astronaut, listing his birthday, his teacher's name and his favorite sports. He also wrote on the picture "blow up the school with all the teachers in it." *See Cuff v. Valley Cent. Sch. Dist.*, 559 F.Supp.2d 415, 417 (S.D.N.Y.2008). The Court dismissed plaintiff's First Amendment claim pursuant to Rule 12(b)(6), finding it to be a threat that was transmitted directly to a teacher. On appeal, the Court of Appeals reversed, finding that the pleadings did not establish that it was reasonable to foresee a material and substantial disruption to the school. *Cuff v. Valley Cent.*

*Sch. Dist.*, 341 Fed.Appx. 692, 693 (2d Cir.2009). On remand, the Court granted summary judgment on plaintiff's First Amendment claim in defendants' favor. *See Cuff*, 714 F.Supp.2d. 462.

These cases all involve the question of whether it was reasonably foreseeable for the student's communication to come to the attention of school authorities. *See Wisniewski*, 494 F.3d at 39–40 (finding that it was reasonably foreseeable that icon would come to attention of school authorities and subject teacher); *Cuff*, 341 Fed.Appx. at 693 (observing that threat was not shown to any classmates); *D.F.*, 386 F.Supp.2d at 123 (student read the story to other students in the class and then to more students in another class). These cases turn on the issue of the students' presentation of his communication to teachers, school officials or fellow students. As such, they require a finding by the Court that it was reasonably foreseeable that the students' communications would be broadcast publicly.

■ According to the proposed amended complaint, DC "was found in possession" of the song lyrics. There is no indication that DC shared the lyrics, that they were viewable on his desk or otherwise published to DC's classmates or teachers. Therefore, the Court cannot conclude that DC has failed to assert a First Amendment claim as a matter of law. Defendants have not submitted any evidence that DC's lyrics were a distraction or could have been a distraction. Indeed, on a Rule 12(b)(6) motion they cannot offer such evidence. The Court finds that plaintiffs have set forth a claim for violation of DC's First Amendment rights. *Cf. Sassone v. Quartararo*, 598 F.Supp.2d 459, 470 (S.D.N.Y.2009) (denying motion to dismiss First Amendment claim of public employee under current standard when no evidence of disruption could be offered);

*Walsh v. City of Auburn,* 942 F.Supp. 788 (N.D.N.Y.1996) (same under former *Twombly* standard).

The Court recognizes that plaintiffs alleged in the complaint that Bouldin had reviewed the document and that Avella wrote that plaintiff was "exhibiting disruptive behavior" when he was "observed during first period class, showing students a document that he wrote containing racial slurs, epithets, and inflammatory remarks." These statements, at this stage, are insufficient to establish the truth of the matter asserted within them. The Court would benefit from a fuller development of the record regarding this incident and the First Amendment analysis. Dismissal will be denied as to plaintiffs' First Amendment claim.

■■■■■ Defendants contend that their actions are protected by qualified immunity. Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). A qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998).

■■■■■ The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular ... conduct." *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity applies if the official's mistake as to what the law requires is reasonable. *Id.* It does not apply if, on an objective basis, it is obvious that no reasonably competent official would have taken the actions of the alleged violation. *Malley,* 475 U.S. at 341, 106 S.Ct. 1092.

Whether qualified immunity protects the individual defendants who were involved in the song lyrics incident turns on whether it was reasonably foreseeable for the song lyrics to be disseminated or shared or to become public. As to this question, the Court would benefit from a fuller record. Qualified immunity is denied at this stage of the proceedings.

## III. Title VI Claim

Count three of the complaint alleges violations of DC's rights under Title VI, 42 U.S.C. § 2000d, and 42 U.S.C. § 1983 based on defendants' alleged unequal treatment of DC as compared to the minority students also involved in the October 28 incident and for the creation of a hostile education environment.

■■■■ Title VI prohibits programs that receive federal funding from discriminating on the basis of race. 42 U.S.C. § 2000d.[2] The proper defendant on a Title VI claim is the entity that receives federal funding. *Kelly v. Rice,* 375 F.Supp.2d 203, 208 (S.D.N.Y.2005). A defendant cannot be sued in individual capacity under the law because he does not receive federal financial assistance. *DT v. Somers Cent. Sch. Dist.,* 588 F.Supp.2d 485, 493 n. 11 (S.D.N.Y.2008).

**2.** As noted by the Supreme Court, Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies to all programs receiving federal funds, not only educational programs" *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

## A. Individual Liability Under Title VI

Courts within the Second Circuit have disagreed as to whether individuals may be held liable under Title VI in their official capacities. *See Peters v. Molloy College,* 2008 WL 2704920, *7–8, 2008 U.S. Dist. LEXIS 52194, *20–21 (E.D.N.Y. July 8, 2008) (citing cases); *see also Karlen v. Westport Bd. of Educ.,* 638 F.Supp.2d 293, 302 (D.Conn.2009) ("Although there is no consensus in this Circuit, it seems unlikely that a claim can be stated against an individual defendant sued in her official capacity for violation of Title VI, as the individual does not receive Federal funding.").

■■■ The Supreme Court has noted the similarities in the language and application of Title VI and Title IX. *See Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) ("Congress modeled Title IX after Title VI of the Civil Rights Act of 1964, and passed Title IX with the explicit understanding that it would be interpreted as Title VI was."); *see also Alexander v. Sandoval,* 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Title IX . . . was patterned after Title VI of the Civil Rights Act of 1964."); *Gebser,* 524 U.S. at 286, 118 S.Ct. 1989 ("The two statutes operate in the same manner . . . ."). Therefore, a review of the precedent interpreting Title IX is relevant and leads the Court to conclude that Title VI does not permit a claim against an individual in his official capacity.

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Courts interpreting this language have held that a claim may not be maintained against an individual. *See, e.g., Zamora v. N. Salem Cent. Sch. Dist.,* 414 F.Supp.2d 418, 423 (S.D.N.Y.2006). Title VI's language is similar. It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Because the language of the two statutes are analogous as they apply to activities "receiving Federal financial assistance," the Court will interpret the two statutes similarly. Therefore, the Court concludes that no claim may be maintained against an individual under Title VI even in his official capacity. The Court will dismiss plaintiffs' Title VI claims asserted against the individual defendants. Plaintiffs do not dispute this dismissal.

## B. Discrimination Under Title VI

The motions to dismiss address the standard for a school's failure to stop student-on-student harassment under Title VI. Plaintiffs assert two claims under Title VI—one for racial discrimination by school officials and one for the officials' failure to address the racial harassment that DC suffered. A claim for racial discrimination under Title VI is analyzed under the standard set forth in *Tolbert v. Queens College,* 242 F.3d 58, 69 (2d Cir.2001), while a claim related to harassment is evaluated under a "deliberate indifference" standard. Defendants do not address the *Tolbert* standard in their motions.

■■■ Under *Tolbert,* plaintiffs alleging a claim of discrimination under Title VI must plead (1) that defendants discriminated against them on the basis of race, (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for defendants' actions. *Lopez v. Webster Cent. Sch. Dist.,* 682 F.Supp.2d 274, 277

(W.D.N.Y.2010). Second Circuit precedent requires that the allegations of racial animus be pled with particularity. *See Rivera–Powell v. New York City Bd. of Elections,* 470 F.3d 458, 470 (2d Cir.2006); *Lopez v. Bay Shore Union Free Sch. Dist.,* 668 F.Supp.2d 406, 414 (E.D.N.Y.2009). Such particularity may include identifying derogatory comments made by a defendant in plaintiffs' presence. *See, e.g., Hicks v. IBM,* 44 F.Supp.2d 593, 598 (S.D.N.Y.1999).

▮▮ Plaintiffs claim that the School District discriminated against them through the following actions: (1) Balducci and Avella accusing him of using racial epithets and not mentioning the epithets used against DC; (2) Avella insinuating that DC was racist and that he was headed to prison; (3) Byrnes telling DC not to attend the football game on October 31; (4) Avella detaining DC in her office on October 31 without permitting him to call his parents; (5) no punishment being meted out against the minority students involved in the October 28 incident; (6) the bus incident on the afternoon of October 31; (7) DC being punished on December 5 for possessing the song lyrics; (8) DC's suspension; and (9) the School District never informing DC of the graffiti in February 2009 and April 2009.

Plaintiffs' complaint sufficiently pleads intentional discrimination as to the events of October 2008, including the aftermath of the fight on October 28, his warnings to avoid the football game on October 31 and Balducci's reaction to the harassment at the school bus on October 31. As to these incidents, plaintiffs have sufficiently pled that school administrators made comments based on DC's race and staff as well as different reactions to white and minority participants in the incidents. The Court will leave plaintiffs to their proof on this claim.

▮▮ On the other hand, there are no allegations of any intentional discrimination by the school administrators in how they handled the song lyrics incident, DC's suspension or the graffiti threats. Therefore, plaintiffs cannot rest a Title VI claim on these incidents.

## C. Creation of a Hostile Education Environment

▮▮ Plaintiffs' claims that individual defendants' action created a hostile education environment pursuant to Title VI are analyzed under the "deliberate indifference" standard. To allege a claim for hostile education environment under Title VI, a plaintiff must plead: "(1) the alleged harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the funding recipient had actual knowledge of the ... harassment; and (3) the funding recipient was deliberately indifferent to the harassment." *M. v. Stamford Bd. of Educ.,* 2008 WL 2704704, *8, 2008 U.S. Dist. LEXIS 51933, *23 (D.Conn. July 7, 2008) (discussing claim under Title IX); *see also Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (Title IX case); *Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134 (2d Cir.1999); *DT,* 588 F.Supp.2d at 493. Liability can only be found in "circumstances wherein the [funding] recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis,* 526 U.S. at 645, 119 S.Ct. 1661. Defendants only challenge plaintiffs' allegations that the School District was deliberately indifferent to the October 28 incident; they do not address the other two prongs of the analysis. The Court will find that plaintiffs have met their burden as to those prongs at this stage.

The Court of Appeals has provided that "[d]eliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances" or "when remedial action only follows after a lengthy and unjustified delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir.2003). The deliberate indifference "must, at a minimum, cause [the student] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645, 119 S.Ct. 1661. The "unreasonable" standard does not turn the inquiry into a negligence standard. Instead, "[d]eliberate indifference is more than a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Doe v. Derby Bd. of Educ.*, 451 F.Supp.2d 438, 447 (D.Conn.2006). That is, to avoid liability, the school district "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649, 119 S.Ct. 1661. "[D]eliberate indifference will often be a fact-based question, for which bright line rules are ill-suited." *Doe*, 451 F.Supp.2d at 447.

The Supreme Court has rejected the notion that victims of peer harassment have a right under Title VI to make particular remedial demands. *Davis*, 526 U.S. at 648, 119 S.Ct. 1661. Rather, courts should avoid second guessing school administrators' decision and should defer to the judgment of those administrations that are important to the "preservation of order in the schools." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n. 9, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Davis*, 526 U.S. at 648, 119 S.Ct. 1661.

■ Under this standard, the Court finds that plaintiffs have sufficiently pled that the School District had actual notice of the harassment as of October 28 through Avella's and Balducci's reaction to the October 28 incidents. Therefore, there can be liability for incidents after October 28, namely the bus incident and the warning to DC to avoid the football game on October 31.

Similarly, plaintiffs have pled that the School District was deliberately indifferent to the harassment. By alleging that Avella and Balducci did not address any of the other actors in the October 28 incident, plaintiffs properly plead that they were deliberately indifferent to the alleged instigators of the fight. This deliberate indifference, in turn, made DC susceptible to further harassment as evidenced by the bus incident.[3] There is no allegation that Avella and Balducci spoke with other non-white participants in the incidents who allegedly started it. As such, the complaint leads to the conclusion that the officials only spoke with the victim of the harassment, not the instigators. *See Yap v. Oceanside Union Free Sch. Dist.*, 303 F.Supp.2d 284 (E.D.N.Y.2004) (granting summary judgment on racial harassment claim where administrators spoke with alleged instigators). Such allegation can support a claim for deliberate indifference. The Court will leave plaintiffs to their proof on this point.

## IV. Section 1983 Claim

Defendant Avella moves to dismiss plaintiffs' 1983 claim on the ground that it is subsumed by their Title VI claim and that plaintiffs have failed to state a claim under a "deliberate indifference" standard pursuant to section 1983. The remaining defendants seek to dismiss the 1983 claim (1) because plaintiffs did not exhaust their administrative remedies to challenge DC's

---

**3.** The Court takes no position on whether missing a football game is an meaningful educational opportunity or benefit under the law, especially where there is no allegation that DC had planned to attend the game.

suspension and (2) on qualified immunity grounds.

### A. Effect of Title VI on Section 1983 Claim

Prior to 2009, the law in the Second Circuit was that Title VI subsumed any claim under section 1983 against an individual based on a violation of the plaintiff's Title VI's rights. *See, e.g., DT*, 588 F.Supp.2d at 497–98; *Bayon v. State Univ. of N.Y. at Buffalo*, 2001 WL 135817, *3, 2001 U.S. Dist. LEXIS 1511, *8–9 (W.D.N.Y. Feb. 14, 2001) ("Where Congress has established enforcement mechanisms containing remedial devices that are sufficiently comprehensive, as it has done with Title VI and the ADA, those enforcement mechanisms may not be bypassed by bringing suit under section 1983.").

 The Supreme Court decision in *Fitzgerald* casts doubt on the viability of this holding. In *Fitzgerald*, the Supreme Court rejected a finding that Congress meant to subsume section 1983 through the enforcement mechanism of Title IX. *See Fitzgerald*, 555 U.S. 246, 129 S.Ct. 788. Rather, the Court noted that at the time of Title IX's enactment in 1972, Title VI—upon which it was modeled—was interpreted to permit parallel and concurrent section 1983 claims. See *id.*, 555 U.S. at 258–59, 129 S.Ct. at 797. In reaching this conclusion, the Supreme Court cited approvingly of the cases supportive of that holding. *See Alvarado v. El Paso Independent School Dist.*, 445 F.2d 1011 (5th Cir.1971); *Nashville I–40 Steering Comm. v. Ellington*, 387 F.2d 179 (6th Cir.1967); *Bossier Parish School Bd. v. Lemon*, 370 F.2d 847 (5th Cir.1967). In light of the Supreme Court's holding in *Fitzgerald* and

its citations to *Alvarado, Nashville I–40* and *Bossier Parish*, the Court now concludes that Title VI does not preclude a section 1983 claim.[4]

### B. Section 1983 Claim Against Avella and Balducci

 To establish individual liability under section 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004). A defendant may only be held liable when he is personally involved in constitutional deprivation. *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir.1991).

For the reasons expressed above regarding plaintiff's Title VI's harassment and discrimination claims, the Court will not dismiss plaintiffs' section 1983 claims against Avella. Similarly, the Court will not dismiss the harassment claim against Balducci because the allegations of the complaint state a claim that Balducci was deliberately indifferent to the harassment following the events of October 28. There can be no claim against Balducci for discrimination because there are no allegations of improper statements made by him.

### C. Claims Against Other Individual Defendants

 As to the other individual defendants—Hooley, Lynker, DiMaio, Taylor, Giudice, Bouldin and Wimmer—there are insufficient allegations in the complaint

---

4. The Second Circuit Court of Appeals has not yet addressed this issue in light of *Fitzgerald*. In the appeal of the Court's ruling in *DT*, the Court of Appeals noted that plaintiff did not address the district court's dismissal of the section 1983 claim. The Court of Appeals then declined to address whether Congress intended to permit parallel and concurrent claims. *See DT v. Somers Cent. Sch. Dist.*, 348 Fed.Appx. 697, 699 n. 1 (2d Cir.2009).

to support a claim that they acted in a discriminatory manner or were deliberately indifferent to any harassment. As to defendant Hooley, there is no racial element alleged regarding DC's suspension for his song lyrics. As to defendant Lynker, the insufficiency of her investigation is not indicative of deliberate indifference. Her reaction, as pled in the complaint, does not amount to deliberate indifference under the law. The claims regarding Di-Maio, Taylor and Giudice stem from the IDEA process. Because plaintiffs failed to exhaust their administrative remedies, there can be no claims under section 1983 against individual defendants for violations of the IDEA or Rehabilitation Act. Next, defendant Giudice cannot be liable under section 1983 for a violation of the Fourth Amendment, which is only implied in the complaint. Similarly, Bouldin's and Wimmer's conduct does not make them liable under section 1983.

There can be no claims under section 1983 related to the graffiti threats as there are insufficient allegations to support the view that the school officials' response was insufficient or constituted deliberate indifference. Further, the incident does not state a claim for race discrimination as there were no racial elements to it or to the officials' response.

### D. *Monell* Claim

A school district may be liable for deprivation of a citizen's rights pursuant to 42 U.S.C. § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Fitzgerald*, 555 U.S. 246 at 258–59, 129 S.Ct. at 797 (discussing school district liability under section 1983). A school dis-

trict may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Here, there is no evidence to support a *Monell* claim. Plaintiffs have neither identified nor proffered any evidence of a specific school policy or custom that caused him to be subjected to any harassment. Further, plaintiffs' allegations of a pattern and practice through a failure to train or supervise its employees lack the requisite specificity. Dismissal of plaintiffs' *Monell* claim is appropriate.

### E. Qualified Immunity

Even if the Court had found that the individual defendants had committed actions which would create liability under section 1983, they would be protected by qualified immunity for their respective conduct. With the exception of Avella's and Balducci's conduct, none of the actions by the individual defendants violated clearly established federal constitutional or statutory rights.

### V. Safe Schools Act Claim

Defendants seek to dismiss plaintiffs' claim that they violated DC's rights under the Safe and Drug–Free Schools and Communities Act, 20 U.S.C. § 7133, which is contained in the ninth count of the complaint. The reference to the Safe Schools Act was not included in the proposed second amended complaint, and the Court believes that plaintiffs have abandoned it. Section 7133 is a mechanism for awarding grants and does not appear to create any private rights. Such claim will be dismissed to the extent that it has not already been abandoned.

## VI. Claim Under Rehabilitation Act, ADA and the IDEA

Count five of the complaint alleges that the School District and the School District Board of Education violated plaintiffs' rights under section 504 of the Rehabilitation Act, the ADA and the IDEA. Defendants seek to dismiss this claim because plaintiffs have failed to exhaust their administrative remedies. Plaintiffs do not contest that they have failed to do so; they contend that exhaustion of administrative remedies would have been futile. They first state that they did not do so because in the time that it would have taken to pursue their administrative remedies, DC would have graduated high school. Second, they allege that there is an appearance of bias in the Office of State Review that would have prevented them from obtaining a fair hearing.

### A. IDEA Claim

The IDEA provides federal grants to states so that they may in turn provide disabled children with "a free appropriate public education" in the least restrictive, appropriate environment. *See* 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A). Under the IDEA, the student's educators and parents meet and jointly develop an individual education plan ("IEP") for each year of the child's education. *See Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.,* 288 F.3d 478, 482 (2d Cir.2002); 20 U.S.C. §§ 1401(11), 1414(d); *see also P.J. v. Conn. Bd. of Educ.,* 788 F.Supp. 673, 676 n. 1 (D.Conn.1992) ("The IEP is produced by what is known as the planning and placement team, which must include a qualified special education representative of the school board, the child's teacher, and one or more of the child's parents, and may also include individuals who evaluate the child or provide special education services to the child."). It is through the IEP

that the school may monitor the student and his progress. *Polera,* 288 F.3d at 482.

The IDEA provides for procedural safeguards through which parents can ensure their child's education. 20 U.S.C. § 1415(a). These procedural safeguards include the rights "to examine all records relating to [the] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child and to obtain an independent educational evaluation of the child," *id.* § 1415(b)(1), written notice prior to any changes in the child's identification, evaluation or educational placement, *id.* § 1415(b)(3), "an opportunity to present complaints with respect to" such matters, *id.* § 1415(b)(6), and, whenever any such complaint is made, the right to "an impartial due process hearing ... by the State educational agency or by the local educational agency," with corresponding rights to be accompanied and advised by counsel, to present evidence and cross-examine witnesses, to receive a written record of proceedings, and to receive written findings of fact and decisions. *Id.* § 1415(f)(1) & (h).

The specifics of the administrative process by which a parent can challenge deficiencies in the IEP are proscribed in accordance with state procedures. In New York, parents who believe that an IEP is insufficient under the IDEA may challenge it in an "impartial due process hearing" before an impartial hearing officer ("IHO"), who is appointed by the local board of education. N.Y. Educ. Law § 4404(1). The burden there lies with the school district to demonstrate the appropriateness of the proposed IEP. *See, e.g., Walczak,* 142 F.3d at 122 (collecting cases). The IHO's decision may be appealed to a State Review Officer ("SRO"). N.Y. Educ. Law § 4404(2). The SRO's decision may

be challenged in district court. 20 U.S.C. § 1415(i)(2)(A).

■ Failure to exhaust the administrative remedies required by the IDEA precludes the court from exercising subject matter jurisdiction over the action. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir.2008). This requirement is meant to "channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." *Polera*, 288 F.3d at 487. The reliance on administrative procedures is meant to ensure that "parents seek changes to a student's program." *Id.* at 483. A plaintiff must exhaust his administrative remedies even though he has claims under both the IDEA and 42 U.S.C. § 1983. *Cave*, 514 F.3d at 245 n. 2. As the Court of Appeals stated:

> Exhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.

*Polera*, 288 F.3d at 487. "Whether the administrative process is able to remedy the injury must be viewed at the time of the injury, not when the suit was filed." *M. v. Stamford Bd. of Educ.*, 2008 WL 4197047, *2, 2008 U.S. Dist. LEXIS 67988, *6 (D.Conn. Sept. 9, 2008).

■ Certain exceptions to the exhaustion requirement do apply. Where a plaintiff claims a failure to implement an existing-IEP, she need not exhaust her administrative remedies. Additionally, where a plaintiff seeks relief that is not available under the IDEA, such as compensatory damages for injuries, exhaustion is excused. Finally, where exhaustion would be futile, such as where the student has died or the administrative process involves a non-neutral arbiter, exhaustion is also excused. *See Heldman v. Sobol*, 962 F.2d 148 (2d Cir.1992); 34 C.F.R. §§ 300.506–.507.

■ Plaintiffs argue that the exhaustion requirement should be excused because DC was to graduate high school shortly after these issues arose and resorting to administrative remedies would have been futile. *Polera* compels a rejection of this argument claim. Plaintiffs admit that they sat on a live claim because they could not find counsel. Then when counsel was available, they determined that they need not exhaust the available administrative remedies because DC was to graduate very soon. Only because of plaintiffs' conduct was exhaustion futile. *See Polera*, 288 F.3d at 490 ("In contrast, had Polera pursued administrative procedures at the time of the alleged wrongdoing, she could have obtained the materials she needed and, perhaps, remedial tutoring or schedule adjustments to undo the effects of the wrong. For Polera, ... a fully effective remedy was available at the time; she simply chose not to pursue it."). Plaintiffs sat on their live claim. *See id.*, 288 F.3d at 490 ("[D]isabled-student plaintiffs ... should not be permitted to 'sit on' live claims and spurn the administrative process that could provide the educational services they seek, then later sue for damages."). Under these facts, exhaustion cannot be excused.

■ Similarly, plaintiffs claim that the administrative process is often slow and there would be no resolution before DC's graduation. Pursuant to New York State regulation, the hearing officer must render his decision within 45 days of the receipt by the board of education of a parent's request for a hearing. *See* 8 N.Y.C.R.R.

§ 200.5(i)(4). Resort to the administrative process would have been swifter than litigation, which is much slower. *See Polera,* 288 F.3d at 490 ("We also consider it incongruous that Polera waited years before pursuing any remedy, yet now claims that the remedy available to her at the time— the administrative process—would have been too slow."). Plaintiffs' theory about the pace of their administrative remedies does not excuse their failure to exhaust. In fact, DC's problems could have been resolved sooner.

■ In addition, plaintiffs argue that exhaustion should be excused because of an apparent bias in the New York State review process. Plaintiffs cite to no case law supporting their argument that because the state review officer is biased, they need not exhaust their administrative remedies, and the Court rejects this argument for several reasons. First, under New York law, the state review officer serves in an appellate function. The first hearing is held before an impartial hearing officer, and there is no allegation that there is any bias or impropriety among the impartial hearing officers. Second, if plaintiffs take issue with an aspect of the administrative processes available in New York, a better action is suit against the state education agency, not the Valley Central School District. *See Fetto v. Sergi,* 181 F.Supp.2d 53, 72 (D.Conn.2001). Without the proper defendants before the Court, the Court can do nothing about any alleged violations of the IDEA present in this matter. And, without any power to rectify this alleged impropriety, the Court will not accept it as an excuse.

Third, plaintiffs' evidence in support of an apparent bias in the system is based on an article appearing in the Wall Street Journal in 2007. *See* Daniel Golden, *Staying the Course: Schools Beat Back Demands for Special Ed Services—Parents Face Long Odds Amid Cost Concerns,* Wall St. Journal, July 24, 2007 at 1A. This article raises issues about the State Review Officer at the time and his conclusions. It says nothing about the state of affairs as it existed in 2009, nor does it support any point aside from parents' success rate before the SRO. Perhaps this is due to school districts' success in enforcing the IDEA or accommodating special needs students. Finally, a newspaper article constitutes inadmissible hearsay. *See McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom."). The article fails to raise plaintiffs' arguments above the vague and conclusory level insofar as the SRO's apparent bias may reflect upon defendants.

The Court will not excuse plaintiffs' failure to comply with the administrative requirements of the IDEA in this case, and all such claims will be dismissed.

## B. Claims under the ADA and Rehabilitation Act

■ Plaintiffs' claims under the ADA and the Rehabilitation Act must also be dismissed for plaintiffs' failure to exhaust administrative remedies. Plaintiffs' allegations are that defendants failed to properly address DC's ADHD. Because the relief sought for violations of these statutes is the same as the relief available under the IDEA, exhaustion is required. *See Cave,* 514 F.3d at 246; *J.S. v. Attica Cent. Schs.,* 386 F.3d 107, 112 (2d Cir.2004) ("The exhaustion requirement also applies where plaintiffs seek relief under other federal statutes when relief is also available under the IDEA.").

In addition, defendants seek to dismiss these claims on the grounds that they are not permitted to be asserted against indi-

viduals. The Court agrees. Neither Title II of the ADA nor section 504 of the Rehabilitation Act permit suit against state officials in their individual capacities. *See Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir.2001). Plaintiffs' claims under the ADA and the Rehabilitation Act will be dismissed against the individual defendants for this reason as well.

## VII. State Law Claims Against Avella

 Defendant Avella moves to dismiss all state law claims against her because she was not named in the notice of claim as a respondent. Plaintiffs argue that they should be excused from having named Avella in the notice of claim because she was not acting within the scope of her employment during the relevant times.

The New York Education Law provides that no tort action may be maintained against a school district or one of its employees unless a notice of claim is made and served in accordance with section 50–e of the General Municipal Law. N.Y. Educ. Law § 3813(2). Section 50–e(1)(a) states that the notice of claim is a "condition precedent to the commencement of an action" against an employee of a public corporation, including a school district. N.Y. Gen. Mun. Law § 50–e(1)(a). Failure to name such employee in the notice of claim is grounds for dismissal pursuant to Rule 12(b)(6). *See, e.g., Rodriguez v. New York City Police Dep't*, 2010 U.S. Dist. LEXIS 139101, *15–16 (S.D.N.Y. Dec. 30, 2010). This Court has no authority to permit plaintiffs to file a late notice of claim. *See Brown v. Metropolitan Transp. Auth.*, 717 F.Supp. 257, 260 (S.D.N.Y.1989) ("Until the state legislature amends. § 50–e(7) to include federal trial courts, we have no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late notice of claim or to have his notice of claim deemed timely filed.").

Service of a notice of claim is excused where the municipal corporation does not indemnify the individual defendants. *See Costabile v. County of Westchester*, 485 F.Supp.2d 424 (S.D.N.Y.2007); N.Y. Gen. Mun. Law. § 50–e(1)(b). That duty depends on whether the employee was acting within the scope of her employment. In *Costabile*, the Court recognized that whether the defendants were acting in the scope of their employment was a fact intensive issue that could not be properly addressed on the pleadings alone. *Costabile*, 485 F.Supp.2d at 432 (citing cases). The Court also noted that it had to accept the allegations in the complaint as true which led to the conclusion that the defendants' actions may have fallen outside the scope of their employment.

 An employee acts within the scope of her employment when she acts for the purpose of serving her employer. *Poux v. County of Suffolk*, 2010 WL 1849279, *13, 2010 U.S. Dist. LEXIS 44399, *46 (E.D.N.Y. May 4, 2010). When an employee's conduct is motivated by "personal reasons unrelated to the employer's interest," such conduct is outside the scope of employment, *Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir.1997).

In deciding how to discipline DC and other students, Avella was acting well within the scope of her employment as principal. *See DT*, 588 F.Supp.2d at 501. How defendants provide counsel for Avella is of no import to the Court and does not sway the Court's opinion one way or the other.

The Court also notes that both the operative amended complaint and the proposed second amended complaint allege that Avella was acting "within the scope of her capacity as acting school principal of Valley Central High School" at all times. All state law claims against Avella will be dismissed.

## VIII. Claim for Defamation Per Se

■■■■■ Plaintiffs initially asserted a claim for defamation under New York law. Now, they seek to amend that claim and assert one for defamation per se. A claim for defamation requires plaintiffs to plead (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) "of and concerning" the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing special harm or constituting slander per se; and (7) not protected by privilege. *Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir.2001). A "defamatory" statement is one which "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177 (2d Cir.2000). A plaintiff need not plead special harm if he alleges that the defamatory statements (1) charge him with a serious crime; (2) tend to injure another in his trade, business or profession; (3) include a claim that plaintiff has a loathsome disease; or (5) impute unchastity to a woman. *Liberman v. Gelstein,* 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992).

■■■■ Plaintiffs' claim for defamation will be dismissed. They make no allegations of any special harm. Therefore, they must rely on their defamation per se claim.

Plaintiffs claim that defendants' statements that DC is a racist and a bigot led his classmates and teachers to believe it to be true. He also alleges that his suspension implies that he was charged with a serious crime and that his suspension cost him the opportunity to complete his ROTC training which, in turn, caused him to lose his opportunity to a commissioned military career. Finally, he argues, citing Dr. Milton Hollar, a psychiatrist and "expert on race relations," and Dr. Alvin F. Poussaint, Professor of Psychiatry at Harvard Medical Center, that extreme racism is a behavioral disorder, and thus a "loathsome disease."

According to the Restatement of Torts, the crimes recognized within per se defamation are murder, burglary, larceny, arson, rape and kidnapping. Restatement (Second) of Torts § 571, cmt. *g* (1977); *see also Liberman,* 80 N.Y.2d at 435, 590 N.Y.S.2d 857, 605 N.E.2d 344. Any allusion to an unnamed crime which plaintiff deduces from his suspension is simply too attenuated to constitute slander per se and qualify as actionable. Similarly, plaintiffs' comment that his suspension caused him to be unable to complete ROTC training undermines any claim that a verbal statement caused him injury. Plaintiffs cite to no case or treatise holding that an action can be a statement and thus defamatory. In addition, plaintiffs' argument that he lost his opportunity to be a commissioned member of the armed forces is too attenuated to constitute an injury to his trade or business that may come in the future. *See Shakun v. Sadinoff,* 272 A.D. 721, 74 N.Y.S.2d 556 (1st Dep't 1947).

■■■ Finally, as to plaintiffs' claim that racism is a disease, this too has been rejected by the Restatement. The Restatement recognizes that loathsome diseases include only existing venereal disease and other "loathsome and communicable" disease. Restatement (Second) of Torts § 572. No matter whether racism is a mental illness, it does not constitute a "disease" under defamation law. The requirement that the disease be communicable ensures that the defamatory comment serves to isolate the person. Restatement (Second) of Torts § 572, cmt. *c.* Labeling an individual a racist does not isolate an individual as the law contemplates.

Therefore, the Court will not permit plaintiffs to transform their claim into one for defamation per se because such amendment would be futile.

## IX. Claim Under the New York Human Rights Law

Plaintiffs assert that defendants violated their rights under the New York Human Rights Law, New York Exec. Law §§ 292(2), 296(4), 296(6) and 296(7). Section 296(4) provides in pertinent part: "It shall be an unlawful discriminatory practice for an education corporation or association ... to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his race, color...." In their initial complaint, this count was asserted against all defendants, including the School District. Because a school district is not an "education corporation or association" under the law, plaintiffs have withdrawn this claim as to the School District. *See East Meadow Union Free School Dist. v. New York State Div. of Human Rights*, 65 A.D.3d 1342, 886 N.Y.S.2d 211 (2d Dep't 2009) ("[A] school district is a public corporation. Hence, a school district cannot be an 'education corporation' within the meaning of Human Rights Law § 296(4).").

 The individual defendants claim they cannot be held liable under the Human Rights Law because the law does not authorize a claim against the employees of a school district. They do not otherwise seek dismissal of this count on its merits. An employee cannot be found liable under section 296(4) because that section applies only to education corporations, which the employees obviously are not. *JG v. Card*, 2009 WL 2986640, *12 n. 5, 2009 U.S. Dist. LEXIS 85372, *33 n. 5 (S.D.N.Y. Sept. 16, 2009). Individuals may be held liable, however, under section 296(6) for aiding and abetting discrimination by an employ-er. *See Strauss v. New York State Dept. of Educ.*, 26 A.D.3d 67, 73, 805 N.Y.S.2d 704 (3d Dep't 2005). This claim may only stand where a violation of the Human Rights Law is established. *DeWitt v. Lieberman*, 48 F.Supp.2d 280 (S.D.N.Y.1999). The Court will dismiss plaintiffs' claim under section 296(4) but permit plaintiffs' claim under section 296(6) to proceed against all individual defendants except for Avella.

## X. Intentional Infliction of Emotional Distress

 Defendants contend that plaintiffs have failed to state a state law claim for intentional infliction of emotional distress. A claim for intentional infliction of emotional distress under New York law requires plaintiffs to plead (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). The standard for asserting a claim is "rigorous, and difficult to satisfy." *Howell*, 81 N.Y.2d at 121, 596 N.Y.S.2d 350, 612 N.E.2d 699. As the Court of Appeals recognized in *Howell*, it had rejected every claim for intentional infliction of emotional distress because the conduct was not not being sufficiently outrageous or extreme. Those claims upheld by the Appellate Division have been "supported by allegations detailing a longstanding

campaign of deliberate, systematic, and malicious harassment of the plaintiff." *Seltzer v. Bayer,* 272 A.D.2d 263, 264, 709 N.Y.S.2d 21 (1st Dep't 2000). The court may determine in the first instance whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery. *Stuto,* 164 F.3d at 827.

 Plaintiffs allege that defendants committed intentional infliction of emotional distress by (1) failing to properly address any ongoing discrimination and (2) making false statements about DC. Defamatory statements generally cannot constitute extreme and outrageous behavior to support an intentional infliction of emotional distress claim. *See Carlson v. Geneva City Sch. Dist.,* 679 F.Supp.2d 355, 372–373 (W.D.N.Y.2010). Defendants' statements allegedly accusing DC of racism do not amount to sufficient behavior to support a claim. *See Higgins v. Metro–North R.R.,* 318 F.3d 422, 426 (2d Cir.2003) (four statements constituting sexual harassment are not sufficiently "extreme and outrageous" to support a claim for intentional infliction of emotional distress); *James v. DeGrandis,* 138 F.Supp.2d 402 (W.D.N.Y. 2001) (no claim against individuals who had disseminated false statements about a soccer coach having sexual relationships with students); *La Duke v. Lyons,* 250 A.D.2d 969, 673 N.Y.S.2d 240 (3d Dep't 1998) (no claim against co-workers who accused another nurse of euthanizing a patient).

In addition, the Court will not permit plaintiffs to proceed on an intentional infliction of emotional distress claim based on defendants' failure to address the discrimination and violence. Plaintiffs' allegations recognize that each incident was addressed in some way. Any delinquencies in how they were addressed does not rise to the level of extreme or outrageous. Defendants' actions were allegedly not up to the standards preferred by parents, but

they were not "utterly intolerable in a civilized society." *See Niles v. Nelson,* 72 F.Supp.2d 13, 23 (N.D.N.Y.1999). This claim will be dismissed.

## XI. Negligent Supervision Claim

 The seventh count of the complaint asserts a claim for negligent supervision, claiming that defendants breached their duty to train and supervise employees to protect students. A school district has a duty to exercise the same degree of care of its students as a reasonably prudent parent would under the same circumstances; a breach of that duty may form the basis for a claim for negligent supervision. *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F.Supp.2d 387, 402 (E.D.N.Y.2005). A school maintains a duty to supervise both teachers and students. *T.Z. v. City of New York,* 635 F.Supp.2d 152, 185 (E.D.N.Y.2009). The standard for such a claim is whether "a parent of ordinary prudence placed in the identical situation and armed with the same information would invariably have provided greater supervision." *Murray v. Research Found.,* 283 A.D.2d 995, 997, 723 N.Y.S.2d 805 (4th Dep't 2001). Defendants may only be liable for injuries which are reasonably foreseeable, *Estevez–Yalcin v. Children's Vill.,* 331 F.Supp.2d 170, 176 (S.D.N.Y.2004), and proximately related to the school's failure to provide adequate supervision. *See Dia CC v. Ithaca City Sch. Dist.,* 304 A.D.2d 955, 758 N.Y.S.2d 197 (3d Dep't 2003). Only injuries for which the school had sufficient specific knowledge or notice of the conduct which caused the injury can the school be held liable. *Velez v. Freeport Union Free Sch. Dist.,* 292 A.D.2d 595, 596, 740 N.Y.S.2d 364 (2d Dep't 2002).

 Defendants move to dismiss this claim on the grounds that it was not included in the notice of claim, which did not include any negligence claims. Plaintiffs

respond by claiming that defendants have actual knowledge of the claims against them. In their reply, defendants address the merits of plaintiffs' claim.

Plaintiffs state that this claim is subsumed within their Title VI claims and therefore defendants had notice of it through the notice of claim. This negligence claim, however, has its own elements and standards. Plaintiffs provide no reason why it was not included in the notice of claim. Although defendants clearly had notice of the October 28 incident and its aftermath, defendants did not acquire notice that they may be liable under a negligent supervision theory nor did they have notice of the specific underlying facts that would support such a claim. This claim will be dismissed as to all defendants.

Based on the allegations in the proposed amended complaint, defendants Lynker and Taylor were only involved in the threat incident in April 2009. There are no cognizable claims against them. Similarly, the only allegations against DiMaio relate to DiMaio telling DC to go home on October 31 and errors in the report in support of DC's suspension. These allegations are insufficient. Finally, there are insufficient allegations to support any claims against Giudice because of the locker opening and against Wimmer. All claims against these five defendants will be dismissed.

### CONCLUSION

For the foregoing reasons, the Court GRANTS both motions to dismiss in part (Docs. # 27, 30) as well as plaintiffs' motion to amend the complaint in part contained within their memorandum in opposition to the motions to dismiss (Doc. # 38). Plaintiff DC will be permitted to proceed on his (1) First Amendment claim; (2) Title VI claim against the School District, (3) section 1983 claim against Avella and Balducci, and (4) Human Rights Law

§ 296(6) claim for aiding and abetting discriminatory practices against all individual defendants except for Avella. All claims asserted by TC and KC are hereby dismissed; DC will be the sole plaintiff. All claims against Lynker, DiMaio, Giudice, Taylor and Wimmer are dismissed.

Because the Court has rejected some of plaintiffs' proposed amendments to the complaint, plaintiff DC is instructed to file an amended complaint within fourteen days of the filing of this ruling.